# State of Vermont v. Gary Wood

[536 A.2d 902]

No. 84-199

Present: Allen, C.J., Dooley, J., and Barney, C.J. (Ret.), Keyser, J. (Ret.) and Springer, D.J. (Ret.), Specially Assigned

Opinion Filed August 7, 1987

Motion for Reargument Denied October 8, 1987

*Jeffrey L. Amestoy*, Attorney General, *Elizabeth J. Grant*, Assistant Attorney General, and *Steve Norten*, Law Clerk (On the Brief), Montpelier, for Plaintiff-Appellee.

*David W. Curtis*, Defender General, and *David Carpenter* and *William A. Nelson*, Appellate Defenders, Montpelier, for Defendant-Appellant.

**Allen, C.J.** The defendant appeals his conviction of aiding in the concealment of stolen property in violation of 13 V.S.A. § 2561. He claims error in the trial court's denial of his pretrial motion to suppress the product of a warrantless search by state police officers. The trial court denied the motion, concluding that the defendant lacked standing to challenge the search under the Fourth Amendment of the United States Constitution, and Chapter I, Article Eleven of the Vermont Constitution. We hold that the defendant has standing to challenge the search under the Vermont Constitution, and reverse the court's ruling. The defendant's conviction is vacated and the matter remanded for further proceedings.

## I.

The challenged evidence in this case is testimony, documents and other evidence identifying a car and two motorcycles as well as the vehicles themselves. These vehicles were seized by a state police officer from the yard of a summer camp where the defendant was staying. The officer conducted the search that yielded the vehicles, without a warrant, as part of an investigation into the theft of stolen motorcycles from members of the "Blue Knights" motorcycle club.

The defendant, his wife and child occupied a trailer situated on the summer camp property. The camp was located in a remote summer resort development near Woodford, Vermont. A wooden camp dwelling was also on the property. The yard surrounding the buildings was bounded by a dirt road on one side and by woods on the other three sides. The property had approximately 44 feet of frontage along the road, and a depth of between 80 and 100 feet. The road frontage was marked by shrubs and a stone wall with an opening for a driveway.

The defendant and his family had stayed in the trailer for two weeks before the search. The defendant's wife had been given permission to stay in the trailer by its owner, who was the caretaker of the premises and the brother of the owner of the land upon which the camp and trailer were located. The camp caretaker was an acquaintance of the defendant and knew that he was on the property. The caretaker observed the defendant on the property on two occasions, and although he never expressly told the defendant he could stay, he never told him to leave. The

camp caretaker often allowed people to stay at the camp on a casual basis in this manner, and the camp and trailer were generally left unlocked. Cars and other motor vehicles were left from time to time on the property with the caretaker's permission.

The search and seizure were conducted while the defendant was away from the camp. After determining that the vehicles were stolen, the officer impounded them, and the defendant was charged with aiding in the concealment of stolen property. Before trial, the defendant moved to suppress testimony or documents identifying the stolen car and motorcycles, contending they were the products of an unlawful warrantless search.

The trial court held that the defendant did not have standing to contest the search, and denied the motion without addressing defendant's challenge to the lack of a warrant. Applying the test developed by the United States Supreme Court in *Rakas* v. *Illinois*, 439 U.S. 128, 143 (1978), the court concluded that the defendant did not have a "legitimate expectation of privacy" interest in the camp grounds where the stolen vehicles were found. While its decision was based on *Rakas*, the court also held that the defendant lacked standing under the Vermont Constitution, without conducting a separate analysis.

The State argues the defendant did not present his state constitutional claim to the trial court, and therefore did not adequately preserve the question for appeal. A review of the record demonstrates that the claim was preserved. On appeal, the parties have carefully briefed the issue of whether the federal rule of standing should be applied to Chapter I, Article Eleven.

## II.

In *State* v. *Jewett*, 146 Vt. 221, 229, 500 A.2d 233, 238 (1985), this Court declared that:

> [t]o protect his or her client, it is the duty of the advocate to raise state constitutional issues, where appropriate, at the trial level and to diligently develop and plausibly maintain them on appeal. It is the corresponding obligation of the Vermont Supreme Court, when state constitutional questions of possible merit have been raised, to address them
> . . . .

Declaring that the claim should be reviewed under the state constitution does not necessarily mean extending the state constitutional protection beyond the federal law. As stated in *Jewett*, this Court must avoid the use of the "state constitution chiefly to evade the impact of the decisions of the United States Supreme Court. Our decisions must be principled, not result-oriented." *Id.* at 224, 500 A.2d at 235.[1]

■ A number of rationale for divergence from federal constitutional doctrine are set forth in *Jewett*. These include the determination that either the plain meaning or historic purpose of the applicable state constitutional provision mandates a different definition from that assigned to the federal provision. In our view, current Fourth Amendment standing analysis is inconsistent with both the plain meaning and historic purpose of Article Eleven, and this Court must therefore adopt a standing analysis independent of the approach taken by the United States Supreme Court.[2]

---

[1] The United States Supreme Court's decision in *Stone* v. *Powell*, 428 U.S. 465 (1976), has magnified the importance of state constitutional analysis of search and seizure issues, including standing analysis. In *Stone*, the Court held that federal district courts would no longer have jurisdiction to review by writ of habeas corpus a prisoner's claim that his conviction in state court was based on improperly gathered evidence under the Fourth Amendment, if the defendant was "provided an opportunity for full and fair litigation of a Fourth Amendment claim" in the state trial and appellate courts. *Id.* at 494. The Court thus established that federal courts, except for the Supreme Court by direct appeal, would no longer provide a forum for the review of a state court's Fourth Amendment decisions. The effect of this holding is to make the state supreme court the court of last resort for the review of a large majority of search and seizure claims. This brings the state claim to the forefront, for the state constitution may be interpreted to provide greater protection of the defendant's rights than the federal constitution. *State* v. *Badger*, 141 Vt. 430, 449, 450 A.2d 336, 347 (1982). Upon review of the state claim, the defendant will be assured that his constitutional rights have been given the most complete consideration by the state court in its capacity as the court of last resort.

[2] Plain meaning and historic purpose are "distinctive and identifiable attributes of a state government." *State* v. *Hunt*, 91 N.J. 338, 368, 450 A.2d 952, 967 (1982) (Handler, J., concurring). The determination that the plain meaning and historic purpose of Article Eleven are inconsistent with current Fourth Amendment standing analysis thus comprises the required "plain statement" of the state grounds upon which the opinion rests. *Michigan* v. *Long*, 463 U.S. 1032, 1041 (1983). Additionally, in view of the "adequate and independent state grounds" requirement of *Michigan* v. *Long*, it should be noted that:

> [W]hen this court cites federal or other State court opinions in construing provisions of the [Vermont] Constitution or statutes, we rely on those

## III.

The trial court's determination under *Rakas* that the defendant lacked standing to challenge the search in this case highlights the change that has occurred in Fourth Amendment standing analysis. The *Rakas* standard is markedly different from and more stringent than that announced in its predecessor, *Jones* v. *United States*, 362 U.S. 257, 260-62 (1960), for it both altered the focus of Fourth Amendment analysis, and increased the burden imposed upon a defendant seeking to invoke the protection of the Fourth Amendment.

### A.

*Rakas* transformed the review of an accused's Fourth Amendment claim from an evaluation of the reasonableness of the challenged governmental conduct under the warrant requirement to an assessment of whether the defendant has demonstrated a privacy interest sufficient to come within the protection of the Fourth Amendment. Before that decision, it was emphasized "[o]ver and again . . . that the mandate of the [Fourth] Amendment requires adherence to judicial processes." *United States* v. *Jeffers*, 342 U.S. 48, 51 (1951).

> Thus the most basic constitutional rule in this area is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz* v. *United States*, 389 U.S. 347, 357. The exceptions are "jealously and carefully drawn," *Jones* v. *United States*, 357 U.S. 493, 499, and there must be "a showing . . . that the exigencies of the situation made that course imperative." *McDonald* v. *United States*, 335 U.S. 451, 456.

*Coolidge* v. *New Hampshire*, 403 U.S. 443, 454-55 (1971). The inquiry into the reasonableness of a search might also have concentrated on the validity of the warrant relied on to conduct the search if one had been obtained. See, e.g., *Coolidge*, 403 U.S. at 449. In either case, the central focus of Fourth Amendment analy-

---

precedents merely for guidance and do not consider our results bound by those decisions.

*State* v. *Ball*, 124 N.H. 226, 233, 471 A.2d 347, 352 (1983).

sis was on the validity of the search, viewed in the light of the warrant requirement of the Fourth Amendment.

In the relativity few cases in which it was conducted, the inquiry into a defendant's capacity to raise a Fourth Amendment challenge was viewed as a collateral question of standing. Standing analysis explored whether the claim was being presented by one "whose rights were violated by the search itself," rather than "aggrieved solely by the introduction of damaging evidence" obtained by a search that violated the Fourth Amendment rights of another. *Alderman* v. *United States*, 394 U.S. 165, 171-72 (1969); see also *Jones*, 362 U.S. at 261; *Simmons* v. *United States*, 390 U.S. 377, 389 (1968). An accused seeking to challenge a search that invaded the rights of someone other than the accused was viewed as a third party to the search, and denied standing to raise the challenge, because "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman*, 394 U.S. at 174.

In those cases where the State contested the defendant's allegation that "he himself was a victim of an invasion of privacy," the preliminary standing analysis ensured that the defendant was invoking his personal Fourth Amendment rights. *Jones*, 362 U.S. at 261. Thus, in *Alderman*, 394 U.S. at 171, it was held that only a defendant whose conversations were improperly overheard could rely on the protection of the Fourth Amendment, while co-conspirators or co-defendants could not vicariously invoke that defendant's interest, and in *Jeffers*, 342 U.S. at 50-52, it was determined that the accused was advancing his rights rather than those of his two aunts, in whose hotel room he was staying.[3]

In *Mancusi* v. *DeForte*, 392 U.S. 364, 368 (1968), a reasonable expectation of privacy test for standing analysis was employed. Nonetheless, the analysis still focused on the collateral inquiry of whether the defendant had "personal standing," *id.* at 367, to challenge an unlawful search of the offices of the union for which he was an officer.

*Rakas* worked a major change in the federal approach to standing analysis. In adopting the "legitimate expectation of privacy" test, the Court declared that its assessment of a defendant's ca-

---

[3] *Jeffers* peremptorily dismissed the government's argument that the defendant lacked standing, stating that "[t]o hold that this search and seizure were lawful as to the respondent would permit a quibbling distinction to overturn a principle which was designed to protect a fundamental right." *Jeffers*, 342 U.S. at 52.

pacity to challenge a search focuses on the substantive merits of the defendant's Fourth Amendment claim rather than on "any theoretically separate, but invariably intertwined concept of standing." *Rakas*, 439 U.S. at 139. The collateral inquiry into whether the defendant was asserting personal rights was transformed into an evaluation of whether the defendant had asserted an interest in privacy sufficient to deserve Fourth Amendment protection. This substantive inquiry is now to be conducted in addition to the defendant's challenge to the reasonableness of the search whenever a defendant makes a Fourth Amendment claim. Indeed, it was recently declared that "[t]he touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy,'" *California* v. *Ciraolo*, 476 U.S. 207, 211, 106 S. Ct. 1809, 1811 (1986) (quoting *Katz* v. *United States*, 389 U.S. at 360 (Harlan, J., concurring)), and in the cases following *Rakas*, this substantive inquiry has been conducted in depth before any assessment of the reasonableness of the search.[4] See, e.g., *Ciraolo*, 476 U.S. at 209-15, 106 S. Ct. at 1810-13; *United States* v. *Knotts*, 460 U.S. 276, 280-85 (1983); *Rawlings* v. *Kentucky*, 448 U.S. at 104-06. The collateral question of standing has thus evolved into a substantive inquiry of equal, if not greater, importance than the resolution of the defendant's challenge to the government's evidence-gathering technique.

---

[4] In *Rawlings* v. *Kentucky*, 448 U.S. 98 (1980), the Court strongly suggested that the substantive inquiry into the legitimacy of a defendant's expectation of privacy would be the sole inquiry under the Fourth Amendment: "After *Rakas*, the two inquiries [standing and review of the challenge to the search] merge into one: whether governmental officials violated any legitimate expectation of privacy held by petitioner." *Id.* at 106. The Court appeared to be asserting that the determination of whether a violation of the Fourth Amendment has occurred, or the conclusion that a search is unreasonable, turns on the inquiry into the legitimacy of the defendant's expectation of privacy in the face of the governmental intrusion.

The Court has yet to go this far, however. *New York* v. *Class*, 475 U.S. 106, 114-15 (1986), contains a two part inquiry: (1) an analysis of whether a "search" occurred, which depended on whether defendant had a legitimate expectation of privacy in the invaded place, and (2) upon finding that such a search had occurred, an assessment of the reasonableness of the search.

## B.

*Rakas* also established that a defendant seeking to present a Fourth Amendment challenge under its "legitimate expectation of privacy" test bears a greater burden than had been required under the previous standing analysis. Until *Rakas*, "anyone legitimately on [the] premises . . . search[ed]" could raise a Fourth Amendment challenge. *Jones*, 362 U.S. at 267. This formula was set aside in *Rakas*, which concluded that "the phrase 'legitimately on [the] premises' coined in *Jones* creates too broad a gauge for measurement of Fourth Amendment rights." *Rakas*, 439 U.S. at 142 (footnote omitted).[5]

In replacing the *Jones* standard with the "legitimate expectation of privacy" test, *Rakas* further decided that the privacy interest must be demonstrated through

> a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society. One of the main rights attaching to property is the right to exclude others, and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude.

*Id.* at 143 n.12 (citation omitted). While the ability to raise a Fourth Amendment challenge does not necessarily depend on an actual property interest after *Rakas*, according to this pronouncement, a defendant challenging a search must exhibit an interest

---

[5] The *Rakas* majority expressed concerns as to the benefits of enlarging the class of persons who might invoke the exclusionary rule, and concluded that these misgivings could properly be considered when deciding whether to expand standing. *Id.* at 137-38. In his dissent, Justice White suggested:

> If the Court is troubled by the practical impact of the exclusionary rule, it should face the issue of that rule's continued validity squarely instead of distorting other doctrines in an attempt to reach what are perceived as the correct results in specific cases.

*Id.* at 157 (White, J., dissenting).

If dissatisfaction with the exclusionary rule is in fact the rationale behind *Rakas*, it is incompatible with Article Four of the Vermont Constitution, which provides each individual a "guaranteed right to a remedy at law" for a harm that is suffered. *In re Stoddard*, 144 Vt. 6, 8, 470 A.2d 1185, 1186 (1983). Restricting the availability of the exclusionary rule as the remedy for a violation of Article Eleven merely because of dissatisfaction with that remedy would be inconsistent with this guarantee.

in the area searched demonstrably greater than that which would have been sufficient under the previous test of whether the defendant was "legitimately on the premises."

Moreover, by holding that the substantive merit of the defendant's claim is assessed by application of the new, more burdensome test, *Rakas* curtailed the scope of the Fourth Amendment's protection. See *Commonwealth* v. *Sell*, 504 Pa. 46, 62, 470 A.2d 457, 466 (1983). A defendant "legitimately on the premises" would have come within the scope of the Fourth Amendment before *Rakas*, but now falls outside of its protection unless the more demanding "legitimate expectation of privacy" test is met.

## IV.

Neither the focus of the federal test away from judicial review of a challenged search nor its curtailment of the scope of the protected right to be free from unlawful governmental conduct is compatible with Article Eleven. In drafting Article Eleven, the framers of the Declaration of Rights vested responsibility and authority in the judiciary to review and restrain overreaching searches and seizures by the government.[6] The federal test limits this judicial function, and it cannot be relied upon to promote the central purpose of Article Eleven.

## A.

Vermont's constitutional Declaration of Rights, of which Article Eleven is an integral part, sets forth the "natural, inherent, and unalienable" rights of the citizenry. Vt. Const. Ch. I, Art. 1. As "unalienable" rights, these were not delegated to the government under the written constitution, but were reserved by the people. The Declaration of Rights thus sets forth those rights which may not be encroached upon by the government.

In fashioning the Declaration of Rights, the authors of our constitution entrusted the judiciary with the primary responsibility

---

[6] The original plan provided for review by the Council of Censors as well as judicial review. Vt. Const. Ch. II § XLIV (1777). The constitutional structure of judicial review assumed its present form with the enhancement of the Supreme Court's jurisdiction in 1824, Acts of 1824, ch. 19 ("an Act, constituting the Supreme Court of Judicature and County Courts, defining their powers and regulating judicial proceedings."), and the abolition of the Council of Censors in 1870. Journal of the Proceedings of the Constitutional Convention of 1870, Art. VI, 71-74 (June 14, 1870).

in the preservation of this constitutional order. Thomas Jefferson described the design of a declaration of rights and the role of the judiciary in a letter to James Madison: "In the arguments in favor of a declaration of rights [described in your earlier letter] you omit one which has great weight with me; the legal check which it puts in the hands of the judiciary." 3 *Writings of Thomas Jefferson* 3 (H.A. Washington ed. 1853) letter of March 15, 1789 (the letter is cited as "Jefferson's reply" in Lasson, *The History and Development of the Fourth Amendment to the United States Constitution*, 55 Johns Hopkins University Studies in Historical and Political Science 211, 288 n.91 (1937)). Madison echoed Jefferson's characterization of the judicial function when he addressed the First Congress and urged the passage of the Federal Bill of Rights:

> [W]hatever may be the form which the several States have adopted in making declarations in favor of particular rights, the great object in view is to limit and qualify the powers of Government, by excepting out of the grant of power those cases in which the Government ought not to act, or to act only in a particular mode . . . .

1 Annals of Cong. 432, 437 (1789).

> If they [the rights] are incorporated into the Constitution, independent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; they will be an impenetrable bulwark against every assumption of power in the Legislative or Executive; they will be naturally led to resist every encroachment upon rights expressly stipulated for in the Constitution by the declaration of rights.

*Id.* at 439, *quoted in United States* v. *Calandra*, 414 U.S. 338, 356-57 (1974) (Brennan, J., dissenting).

Article Eleven plays a crucial role in this plan. It is the authority upon which the judiciary acts to protect the people from unlawful searches and seizures, which are the means historically relied upon by a government seeking to impose its will upon a reluctant people. Judge Cardozo characterized the interest protected by the judiciary as "the social need that law shall not be flouted by the insolence of office." *People* v. *Defore*, 242 N.Y. 13, 24-25, 150 N.E. 585, 589 (1926). Article Eleven interposes a neutral judge between a defendant and the government, and autho-

rizes the judge to review the validity of a search of the defendant. Under Article Eleven, the reviewing court determines whether the search was lawful, or whether the exclusionary rule must be applied to remedy an unlawful search. *Badger*, 141 Vt. at 452-53, 450 A.2d at 348-49.

The legal check operates in this manner each time a court scrutinizes the post-search challenge of an accused upon a motion to suppress. The current federal test curtails this function of the judiciary by focusing on the defendant's ability to present a challenge rather than on the challenge itself, and by unduly limiting the class of defendants who may invoke the right to be free from unlawful searches and seizures. The federal test thus frustrates the design of Article Eleven, and we decline to adopt it.[7]

## B.

■ Article Eleven itself establishes the scope of the protected right, and defines who may invoke its protection. The right of the people "to hold themselves, their houses, papers, and possessions, free from search or seizure," defines a right dependent on a possessory interest, with equal recognition accorded to the item seized and the area intruded upon. By delineating the right as a possessory interest, Article Eleven premises the protected right upon an objectively defined relationship between a person and the item seized or place searched, as opposed to a subjective evaluation of the legitimacy of the person's expectation of privacy in the area searched. See *State* v. *Alston*, 88 N.J. 211, 227-28, 440 A.2d 1311, 1319 (1981). Accordingly, a defendant need only assert a possessory, proprietary or participatory interest in the item seized or the area searched to establish standing to assert an Article Eleven challenge. *Id.* at 228, 440 A.2d at 1319; *Sell*, 504 Pa. at 67, 470 A.2d at 468-69.

---

[7] The failure of the "legitimate expectation of privacy" test to promote restraint of officer discretion in the field through the use of search warrants is illustrated by *United States* v. *Payner*, 447 U.S. 727 (1980). In *Payner* the district court found that "the Government affirmatively counsels its agents that the Fourth Amendment standing limitation permits them to purposefully conduct an unconstitutional search and seizure of one individual in order to obtain evidence against third parties." *Id.* at 730. Although this finding was acknowledged by the Court in *Payner*, challenged evidence was held admissible based upon the conclusion that the defendant had not demonstrated a legitimate expectation of privacy in the challenged evidence. *Id.* at 732.

This test gives the proper scope to Article Eleven, ensuring that a defendant with a protected Article Eleven interest may challenge a search which intrudes upon this interest. The preliminary inquiry into the defendant's standing looks no further than to determine whether the protected interest exists. If that interest is established, the reviewing court shifts its focus to the primary assessment of the substantive Article Eleven challenge.

This standard simplifies the analysis that must be made by courts and those who follow our decision in deciding whether a warrant was required as a prerequisite to a search. The federal test has been inconsistently applied.[8] One court has commented:

> Such distinctions can be drawn, after several months' reflection, by an appellate court, . . . we think that they fail to give any useful guidance to those whom we require to follow their complexities: the policemen on the street.

*State* v. *Settle*, 122 N.H. 214, 219-20, 447 A.2d 1284, 1287 (1982). By contrast, the possessory interest test is more easily applied because it is based on an objective inquiry into the relationship between the suspect and the item to be seized or the place searched, rather than a subjective analysis of the suspect's expectation of privacy.

## V.

In this case, defendant has not asserted a possessory, proprietary or participatory interest in the car and two motorcycles which were seized, and therefore must demonstrate such an interest in the grounds of the trailer, or the area searched, to establish his standing to present his Article Eleven claim. The court's findings, with support in the record, demonstrate defendant's possessory interest in the trailer. The camp caretaker gave express permission to his wife to use the trailer, and at least tacit approval to the defendant. Moreover, the defendant and his family resided in the trailer for two weeks before his arrest. This possessory inter-

---

[8] Compare *United States* v. *Dien*, 609 F.2d 1038, 1044-45 (2d Cir. 1979) (defendant had expectation of privacy in taped box kept in van); and *United States* v. *Meier*, 602 F.2d 253, 255 (10th Cir. 1979) (defendant had expectation of privacy in closed backpack); with *United States* v. *Gaultney*, 581 F.2d 1137, 1141 (5th Cir. 1978) (defendant had no expectation of privacy in taped box in truck); and *State* v. *Schrier*, 283 N.W.2d 338, 346 (Iowa 1979) (defendant had no expectation of privacy in closed knapsack).

est in the trailer sustains his standing under the curtilage doctrine to challenge a search of "the open space situated within a common enclosure belonging to a dwelling house." *State* v. *Stewart*, 129 Vt. 175, 178, 274 A.2d 500, 502 (1971).[9]

The trial court erred in determining that the defendant lacked standing to challenge the legality of the search of the camp yard. The matter must be remanded for a hearing on the merits of the suppression motion.

*Remanded for proceedings consistent with this opinion.*

---

[9] The defendant's constitutionally protected possessory interest in the trailer was not affected by his absence at the time of the search. This possessory interest existed even though he was not there, and his absence at the time of the search did not affect his standing to challenge the search. See *Sell*, 504 Pa. at 67, 470 A.2d at 468 (quoting *Commonwealth* v. *Platou*, 455 Pa. 258, 266-67, 312 A.2d 29, 34 (1973), *cert. denied*, 417 U.S. 976 (1974)).