## State of Vermont v. Gordon Hunt

[555 A.2d 369]

No. 85-235

Present: Peck, J., and Barney, C.J. (Ret.), Costello, D.J. (Ret.), Valente and Jenkins, Supr. JJ., Specially Assigned

Opinion Filed October 21, 1988

*Jane Woodruff, Washington County Deputy State's Attorney*, Barre, and *Maxine Grad, Law Clerk (On the Brief)*, Montpelier, for Plaintiff-Appellee.

*Walter M. Morris, Jr., Defender General*, and *William A. Nelson, Appellate Defender*, Montpelier, for Defendant-Appellant.

**Peck, J.** Defendant Gordon Hunt was charged with first degree murder in Barre City on April 19, 1982. He was subsequently convicted of the charge following a jury trial in Lamoille Superior Court. He appeals his conviction to this Court. We affirm.

In the late afternoon of the day of the murder, Peter Sophos was found shot to death in his first-floor apartment in Barre. The police were called at approximately 4:30 p.m., and various policemen, investigators and personnel from the state's attorney's office began interviewing people at the scene in order to identify them and determine what happened.

The defendant, who was 19 years old, lived with his father in a second-floor apartment, directly above the victim. From an initial conversation with the police it became apparent that he had been home during the period in which the police believed Sophos had been killed, but he denied hearing or seeing anything unusual.

Around 5:30 p.m. a police officer began to investigate the second-floor hallway for evidence. He noticed a broken padlock casing on the attic door. Believing that the lock might have been broken that day in connection with the murder, the officer climbed the stairs to inspect the third-floor area. The attic was dimly lit so he went back downstairs to obtain a flashlight.

During this initial search of the attic defendant followed the police officer and informed him that the attic was "private property," and he "shouldn't go up there." When the officer returned with the flashlight, and a second police officer to help search the attic, defendant again attempted to accompany them; however, the officers told him firmly to remain downstairs.

At about 6:00 p.m. the officers discovered a rifle behind a cabinet in a space large enough to hide a person. They did not touch the rifle, but one of them stayed with it while the other went

downstairs to summon the crime lab team. The latter then obtained the landlord's written permission to search the attic.

Meanwhile, defendant returned to his apartment. He put on his jacket and opened the window in order to jump to a roof five feet below and flee. Before he could accomplish this, however, a police officer knocked on his door, and seeing him in his jacket, with the window open, asked where he was going. Defendant responded that he was going to the store, and the officer asked if he would "stick around" for a little while. He agreed to do so.

Ten minutes later, three officers knocked on defendant's door and asked if he would mind going down to the station so he could be asked some "routine questions." He agreed to go. At this point, defendant was one of two suspects. Although the police intended to obtain statements from a number of people they had spoken to at the apartment building, defendant was the first person asked to go to the station because of "his unnatural curiousity at the crime scene . . . [and] his presence in the building at the time of the murder."

At the station, defendant was taken into an office and read his *Miranda* rights, which he waived. Before waiving his rights, he asked if he was under arrest, and was told he was not. He was then questioned a short time about his knowledge of the victim and the murder, and asked to give a fingerprint sample; he did so. One of the three officers then asked how he could have been in his apartment at the time of the murder, not sleeping or watching television, and not have heard a gunshot. Defendant requested to be left alone with this officer and, before the officer said a word, he confessed to the killing.

After the initial confession, defendant gave taped statements to the police: a more detailed and lengthy explanation of what had occurred, that he had voluntarily accompanied the officers to the police station with the understanding that he was free to leave, and that he was freely making the statements. After the initial confession, he requested to see his father, and was told he could do so at a later time.

During the taped interview, defendant provided the officers with other evidence, including the spent cartridge case which he had thrown out at the station. He also took a breath test which showed that he had no alcohol in his blood, and he submitted to a polygraph test. Finally, he dictated a second statement to the police officers, which was signed by him and notarized.

On April 20, 1982, the Washington County State's Attorney filed an information in Washington Superior Court which charged defendant with the first degree murder of Peter Sophos. At the request of defendant, venue was changed from Washington County to Chittenden County, and the Chittenden Superior Court rejected a plea agreement reached between the defendant and the State which would have resulted in a minimum sentence of ten years to serve. Subsequently, venue was moved, over defendant's objection, to the Lamoille Superior Court by order of this Court, where he was found guilty of first degree murder after a trial by jury. The trial court subsequently imposed a sentence of thirty years to life. This appeal followed.

Defendant makes the following claims of error on appeal:

I. The Vermont Supreme Court acted without jurisdiction, and in violation of defendant's due process rights, when it ordered the venue of the case changed;

II. The Chittenden County assistant judges acted improperly when they rejected the plea agreement;

III. The Lamoille County assistant judges should have been disqualified from participation in the case;

IV. Defendant's Fourth and Fourteenth Amendment rights under the United States Constitution, and Article Eleven rights under the Vermont Constitution, were violated by a warrantless search and seizure done without probable cause or exigent circumstances;

V. Defendant's confession was improperly admitted into evidence;

VI. The State improperly impeached defendant with evidence that defendant failed to make exculpatory claims at the time of his confession;

VII. The trial court allowed impermissible character evidence.

I.

A complicated string of events led to defendant's first claim of error. When the original plea agreement was rejected by the Chit-

tenden Superior Court, defendant challenged the power of the assistant judges to participate in deciding to accept or reject pleas, in an interlocutory appeal. See *State* v. *Hunt*, 145 Vt. 34, 485 A.2d 109, *cert. denied*, 469 U.S. 844 (1984). One of the assistant judges who participated in the Chittenden Superior Court proceedings, in her capacity as president of the Assistant Judge's Association (AJA), allegedly took improper action in an attempt to influence the outcome of the interlocutory appeal. After defendant's appeal was decided, he moved to have the assistant judges who participated in the prior proceedings disqualified. The presiding judge agreed to disqualify the assistant judge who had allegedly taken the action with respect to the appeal. This assistant judge filed a petition for extraordinary relief in this Court challenging the superior court's order disqualifying her. This Court rendered the issue moot by transferring venue to the Lamoille Superior Court. Defendant objected to the transfer by filing a motion to return venue to Chittenden County; the motion was denied.

■ Defendant argues that the Lamoille Superior Court was without jurisdiction to hear the case because the Supreme Court lacked authority to order a change of venue to the Lamoille court. The question is a novel one. It requires us to determine whether the supervisory authority of the Supreme Court encompasses directing a change of venue to prevent a failure of justice. There is, of course, clear statutory authority in the judicial branch to accomplish a change of venue. V.R.Cr.P. 21; 13 V.S.A. § 4631. Ordinarily, the exercise of that power rests with the superior court as expressly provided by law. See *State* v. *Truman*, 124 Vt. 285, 289, 204 A.2d 93, 96 (1964). Nevertheless, it is a responsibility of the court system to provide a fair and impartial tribunal for the conduct of a criminal trial. Neither the State nor defendant has a right — once, on defendant's motion, the preferred place of trial is abandoned — to insist on another particular situs. V.R.Cr.P. 21, Reporter's Notes. Moreover, neither defense nor State has right to hold on to an unfair or biased tribunal in order to take advantage of it as to choice of results, and neither has the right to insist that the trial be held before a court so comprised that the trial will be burdened by possible claims of defective composition or performance above and beyond the ordinary challenges which might arise in such proceedings. To leave that situation in place is to give one side or the other an automatic and undeserved veto

over the outcome to the detriment of either the defendant or the people of the State of Vermont.

Such a situation is both extraordinary and unusual, but was true in this case. Under these circumstances, the inherent power and constitutional command to provide a judicial environment free from the taint of allegations of impropriety is so basic a responsibility of the judiciary that, rather than have the proceedings go forward under circumstances already compromised, the authority of the Supreme Court had to be, and properly was, exercised to bring the case back into a trial alignment consistent with the responsibilities of the judiciary to provide a fair, unbiased and judicious tribunal. See Vermont Constitution Ch. II, § 30; 4 V.S.A. § 2(b). The exercise of judicial authority was unusual, called forth by unusual, indeed, hopefully unique, circumstances. The prosecution of defendant needed to go forward in a setting where his guilt or innocence could be determined by a court free from all contact with past disputes among the attorneys and judges. This was accomplished by removal to Lamoille County and by the assignment of Judge Bryan, who was completely untainted by the unusual series of events which had taken place in this case prior to that time. Although in hindsight it might have been preferable for this Court to have dealt with this situation in another way, this Court's order was reasonable, not draconian, and consistent with the high purposes of the judicial system. Cf. *State* v. *Fields*, 67 Haw. 268, 276, 686 P.2d 1379, 1386 (1984) (supervisory power includes authority to *prevent* and correct errors where no other remedy is expressly provided by law); *State* v. *Gunzelman*, 85 N.M. 295, 299, 512 P.2d 55, 59 (1973) (superintending control allows court to formulate new means to cope with exigencies that call for its exercise); *Brewer* v. *Erwin*, 70 Or. App. 709, 711, 690 P.2d 1122, 1123 (1984) (an appellate court, as incident to its appellate jurisdiction, has such inherent powers as are necessary to enable it effectually to exercise its jurisdiction).

■ Defendant also argues that the Supreme Court order changing venue, rendered without notice to defendant, violated his constitutional right to due process of law. It is a general rule that error will not require reversal unless it is prejudicial to the defendant, depriving him of a fair trial. See *State* v. *Hohman*, 138 Vt. 502, 506-07, 420 A.2d 852, 855 (1980). This Court has recently held that, even where possible constitutional violations have occured, " 'it is the *duty* of a reviewing court to consider the trial

record as a whole and to ignore errors that are harmless . . . .' "
*State* v. *Nash*, 144 Vt. 427, 434, 479 A.2d 757, 761 (1984) (quoting
*United States* v. *Hasting*, 461 U.S. 499, 508-09 (1983) (emphasis
in original). In this case, defendant has failed to demonstrate
prejudice resulting from this change of venue; therefore, we hold
that if there was error here, the doctrine of harmless error ap-
plies.[1] See V.R.Cr.P. 52(a); *State* v. *Baldwin*, 140 Vt. 501, 514,
438 A.2d 1135, 1142 (1981).

Defendant argues that he was harmed by the venue change in a
number of ways, including: (1) the change to Lamoille County re-
sulted in a less urbanized and less educated jury pool; (2) Judge
Morse, the Chittenden presiding judge, was preferable since he
was familiar with the facts and legal issues involved; (3) Judge
Morse had also previously found crucial evidence to be admissible
only by a narrow margin so that, if the objection was raised again,
he might rule in defendant's favor; and (4) because the Chit-
tenden presiding judge had earlier indicated approval of the plea
agreement's minimum sentence of ten years, he was predisposed
to give defendant a minimum sentence of ten years or approve a
new plea agreement if one were reached. These concerns are
highly speculative at best, and we cannot agree that they demon-
strate undue prejudice to defendant in this case.

It is significant that defendant does not claim that the change
in venue deprived him of a fair trial. Rather, defendant argues
that the venue change was detrimental to his defense strategy as
indicated above. This will not, alone, establish prejudice sufficient
to require reversal, as defendant failed to show that his " 'right to
a complete, fair and adequate trial [was] jeopardized.' " *State* v.
*Ahearn*, 137 Vt. 253, 266, 403 A.2d 696, 704 (1979) (citation omit-
ted).[2] Defendant also contends that if the Supreme Court lacked
authority to change venue in this case, then defendant's convic-
tion must be reversed because the Lamoille Superior Court lacked
jurisdiction. We disagree. Even if venue were improperly placed

---

[1] We note that the doctrine of harmless error does not apply when the error is
jurisdictional. *Soucy* v. *Soucy Motors, Inc.*, 143 Vt. 615, 620, 471 A.2d 224, 227
(1983).

[2] We recognize that a defendant may have an interest to be tried in the locality
where the offense occurred; however, by moving for a change of venue from
Washington County to Chittenden County, defendant waived this right. See
*Commonwealth* v. *Aldoupolis*, 390 Mass. 438, 441, 457 N.E.2d 268, 270 (1983).
He has no right, thereafter, to be tried in the county of his choosing.

in the superior court, this error "in no way affects the general jurisdiction of the court over the subject-matter." *Page* v. *Town of Newbury*, 113 Vt. 336, 339, 34 A.2d 218, 220 (1943); see also *In re Jordan*, 129 Vt. 348, 351, 278 A.2d 724, 725 (1971) (departure from the provisions of the venue statute is a defect in process and did not affect the jurisdiction of the court over the subject matter).

Defendant has failed to demonstrate prejudice resulting from the change of venue; therefore, even if there was error, it was harmless and reversal on this issue is not required. See *State* v. *Hamlin*, 146 Vt. 97, 106, 499 A.2d 45, 52 (1985).

## II.

In his second claim on appeal, defendant questions the propriety of the Chittenden County assistant judges' rejection of the plea agreement. Insofar as this Court considered this same issue previously in *State* v. *Hunt*, 145 Vt. 34, 485 A.2d 109, *cert. denied*, 469 U.S. 844 (1984), we will not now reconsider that decision.

It is a well established rule

> that a decision in a case by a court of last resort is the law of the case on the points presented throughout all subsequent proceedings therein, and no question then necessarily involved and decided will be reconsidered by the Court in the same case on a state of facts not different in legal effect.

*Barclay* v. *Wetmore & Morse Granite Co.*, 94 Vt. 227, 230, 110 A. 1, 2 (1920); see *Belock* v. *State Mutual Fire Ins. Co.*, 108 Vt. 252, 255-56, 185 A. 100, 101-02 (1936). This doctrine is similar to that of stare decisis and res judicata in that it is based on the " 'sound public policy which does not permit the parties . . . to go again and again to the Supreme Court upon the same question.' " *Perkins* v. *Vermont Hydro-Electric Corp.*, 106 Vt. 367, 415, 177 A. 631, 653 (1934) (quoting *Guilmont's Adm'r* v. *Central Vermont Ry.*, 82 Vt. 266, 267, 73 A. 580, 580 (1909)).

We note that this challenge includes claims with regard to the propriety of the rejection of the plea agreement not made during defendant's interlocutory appeal. This Court has a " 'well-established policy of avoiding piecemeal appeals.' " *In re Pyramid Co.*, 141 Vt. 294, 305, 449 A.2d 915, 921 (1982) (citation omitted).

Since defendant already fully contested the rejection of the plea in the interlocutory action, we will not now consider challenges that should have been raised during the earlier determination of this issue. See *Barclay*, 94 Vt. at 230, 110 A. at 2; see also *Smith* v. *United States,* 319 F. Supp. 1359, 1361 (D. Vt. 1970), *aff'd*, 455 F.2d 1406 (2d Cir. 1971). To hold otherwise would be contrary to a central purpose of granting interlocutory appeals, which is to advance the ultimate termination of a case. See *Pyramid*, 141 Vt. at 305, 449 A.2d at 921.

## III.

■ Defendant next argues that the Lamoille County assistant judges should have been disqualified from participation in the case because they failed to repudiate alleged ethical misconduct undertaken on their behalf. Defendant alleges that the president of the AJA acted improperly by communicating with the Attorney General with regard to the association's interest in *State* v. *Hunt*, 145 Vt. 34, 485 A.2d 109 (1984). Defendant claims that these alleged acts by the AJA president constituted serious ethical violations, and, in the absence of an indication that the Lamoille assistant judges repudiated these actions, they should be disqualified from participation in the case.

The Code of Judicial Conduct, A.O. 10, Canon 3(C)(1), provides that a "judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned . . . ." Such disqualification is required "whenever a doubt of impartiality would exist in the mind of a reasonable, disinterested observer." *Richard* v. *Richard*, 146 Vt. 286, 288, 501 A.2d 1190, 1191 (1985).

The AJA is an informal professional and political organization, originally formed for educational purposes. All assistant judges of the state automatically qualify for membership, and attendance at meetings appears to be optional. It would be illogical to hold that the Lamoille assistant judges should have been disqualified simply because the president of their association, without their knowledge or approval, acted in an allegedly unethical manner with respect to the case.

On appeal in this context, this Court will only review the actions of the trial court for an abuse of discretion. *Id.* at 287, 501 A.2d at 1190. In this case, defendant has not established that the

presiding judge or assistant judges abused their discretion in this matter. Therefore, we find no error.

## IV.

■ Defendant next argues that the police search of the attic and seizure of the murder weapon violated his rights under the Vermont and United States Constitutions. Defendant contends (1) that he had a legitimate expectation of privacy in the attic, (2) that no exigent circumstances existed to justify the warrantless search, (3) that the warrantless seizure of the rifle was not lawful, and (4) that the rifle and defendant's confessions should have been suppressed as the direct products of the illegal search.

In support of these contentions, defendant cites our recent decision in *State* v. *Wood*, 148 Vt. 479, 536 A.2d 902 (1987). He also cites extensively from decisions of the United States Supreme Court, as well as other federal and state courts. Under the facts of this case, however, it is unnecessary to address these issues.

In this case, the confession was not a fruit of the search of the attic. On the evidence presented there is no indication that the search or discovery of the gun produced defendant's confession. Although defendant was asked by the police for his fingerprints in order to determine if they matched those they expected to find on the gun, his initial confession was given only after a police officer questioned the veracity of defendant's explanation that he was in his apartment at the time of the murder but did not hear anything. The officer asked him how he could "be in [his] apartment at 1:00, awake, not watching TV and not have heard a gun shot?" We cannot say that but for the illegal search and seizure of the gun, defendant would not have confessed to the murder. See *Segura* v. *United States*, 468 U.S. 796, 815 (1984) (evidence will not be excluded as "fruit" of the unlawful search and illegal seizure unless the search is "at least the 'but for' cause of the discovery of the evidence").[3] Consequently, as the confession is not a fruit of the search, it was properly admitted at trial.

■ Since the gun was a direct fruit of the search, its admission into evidence may have been improper should the search be

---

[3] In construing Chapter I, Article Eleven of the Vermont Constitution we rely on Fourth Amendment precedents merely for guidance, but we do not consider ourselves bound by those decisions. See *Michigan* v. *Long*, 463 U.S. 1032, 1041 (1983).

found illegal. *State* v. *Badger,* 141 Vt. 430, 440, 450 A.2d 336, 342 (1982). However, defendant's confession included references to and detailed descriptions of the gun and explanations of why and where he hid the gun; the gun itself was cumulative evidence such that even if its admission was error, the error was harmless. See V.R.E. 103(a) (erroneous evidentiary ruling which does not affect substantial right of a party is harmless error); V.R.Cr.P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."); *Nash,* 144 Vt. at 434, 479 A.2d at 761 (even where there are possible constitutional violations "it is the *duty* of a reviewing court . . . to ignore errors that are harmless . . . .") (citations omitted) (emphasis in orginal).

## V.

Defendant next argues that his confessions should have been suppressed because: (1) they were the fruit of an illegal seizure of defendant; (2) his consent to accompany the police officers to the police station was involuntary; and (3) his confessions were in violation of his right to silence and right to counsel; and (4) the trial court used a legally errroneous standard of proof to determine that his confession was voluntary and not in derogation of his rights to counsel and privilege against self-incrimination.

## A.

First, defendant claims that he was illegally seized when, lacking probable cause to arrest him, the police asked him to accompany them to the police station, without also informing him that he had no duty to go. Defendant concedes in his brief, however, that under the federal constitution it is clear that the failure to inform a defendant that he or she could withhold consent to accompany the police is not sufficient to establish the existence of illegal coercion. See *United States* v. *Watson,* 423 U.S. 411, 424-25 (1976); *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 227 (1973). Defendant contends that the rule should be different under Chapter I, Article Eleven of the Vermont Constitution. He argues that *Schneckloth* and *Watson* are bad decisions which should not be incorporated into Vermont's constitutional law of search and seizure, and that, before a suspect may be deemed to have waived his or her rights against a "seizure" of his or her person, by con-

senting to accompany the police to the station, some showing that he or she was told or otherwise knew that he or she could decline consent should be required. See *State* v. *Johnson*, 68 N.J. 349, 353-54, 346 A.2d 66, 68 (1975); *State* v. *Derrico*, 181 Conn. 151, 159-60, 434 A.2d 356, 362 (1980).

Defendant has fully addressed in his brief how his rights under the Vermont Constitution might differ from those given him under the United States Constitution; however, he failed to do so in his motions and memoranda at trial. Although defendant cited Article Eleven in the introductory paragraph of his pretrial and trial court memoranda, the memoranda failed to discuss the Vermont Constitution in any respect. Understandably, the trial court's ruling on the motion to suppress did not address defendant's state constitutional issue.

We have repeatedly held that "it is the duty of the advocate to raise state constitutional issues, where appropriate, at the trial level . . . ." *State* v. *Jewett*, 146 Vt. 221, 229, 500 A.2d 233, 238 (1985); see *State* v. *Gabaree*, 149 Vt. 229, 231 n.2, 542 A.2d 272, 273 n.2 (1988). Absent extraordinary circumstances or plain error, the trial court should not be reversed when it has not been given an opportunity to consider fully and to rule on the matter before it. See generally *Cameron* v. *Cameron*, 137 Vt. 12, 15, 398 A.2d 294, 296 (1979) ("[W]e will not place a trial court in error for matters not raised before it and which it has not been given the opportunity to correct."); *Dindo* v. *Denton*, 130 Vt. 98, 109, 287 A.2d 546, 552-53 (1972) ("A question cannot be brought to this Court upon which it is made to appear that the trial court had no fair opportunity to pass judgment.") (citation omitted).

Therefore, we follow our decision in *State* v. *Maguire*, 146 Vt. 49, 54, 498 A.2d 1028, 1031 (1985), in which the state constitutional issue was also mentioned but not discussed at trial by the defendant. In *Maguire* we held that, absent a showing of extraordinary circumstances, we would not address an issue on appeal, not properly raised and argued below. *Id.* Having found no extraordinary circumstances warranting review, we decline to apply Vermont constitutional analysis for the first time on appeal.

### B.

Defendant next contends that, given the totality of the circumstances, his consent to accompany the police to the station

was involuntary and that consequently he was unlawfully seized under the Fourth Amendment and his confessions should have been suppressed as a product of this illegality. Under the Fourth Amendment a person has a constitutional right to be free from unreasonable searches and seizures. *Katz* v. *United States*, 389 U.S. 347, 351 (1967). "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States* v. *Mendenhall*, 446 U.S. 544, 554 (1980) (footnote omitted). In *Mendenhall* the United States Supreme Court set out examples of circumstances that might indicate a seizure even where the person did not attempt to decline to go with the police: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* (citation omitted).

In this case, two police officers with a third nearby, in a manner neither threatening nor compelling, asked defendant if he would mind going to the police station to answer some questions. Defendant asked why they wanted him to go with them, and one of the officers answered "we'd like to ask you some routine questions." Defendant then responded that he did not mind accompanying them. Defendant went to the station in a police cruiser but without being handcuffed, and there is no evidence that the police touched him in any way; once inside the station, defendant was read his *Miranda* rights and he asked if he was under arrest. The police informed him that he was not under arrest. Defendant waived his *Miranda* rights and sometime thereafter confessed to the murder.

On the facts of this case we conclude that no seizure of defendant occurred when he voluntarily accompanied the police to the station for questioning. Defendant was not seized simply by the fact that the officers asked him to join them for questioning. See *Immigration & Naturalization Service* v. *Delgato*, 466 U.S. 210, 216 (1984); *Mendenhall*, 446 U.S. at 555. In addition, "the fact that [defendant] was not expressly told by the [officers] that [he] was free to decline to cooperate with their inquiry" does not turn the approach into a seizure since "the voluntariness of [his] responses does not depend upon [his] having been so informed."

*Mendenhall*, 446 U.S. at 555. We find no evidence of express or implied duress or coercion, and neither threats nor show of force. Defendant was simply asked if he would mind accompanying the police to the station for routine questions, and he agreed.[4] See also *State* v. *Baldwin*, 140 Vt. at 512-13, 438 A.2d at 1141. (DUI suspect who voluntarily accompanies police to the station for purposes of a blood test, with no restraint or touching employed by the officers, not under arrest).

## C.

Defendant next argues that requests he made to see his father constituted an assertion of his rights to decline questioning and to counsel, and that confessions obtained as a result of the continued questioning should have been suppressed. The trial court found that on a number of occasions after his initial confession defendant requested to see his father. He was told he could see him at a later time, which was in fact subsequently arranged while he was in the station detention cell.

The trial court also found that the defendant knowingly and intelligently waived his *Miranda* rights. We cannot find, as defendant would have us do, that defendant's request to see his father was an assertion of his rights to remain silent or to an attorney.

Defendant's request to speak with his father was not a per se request to remain silent. There is nothing inherent in the request for a parent by the nearly 19 year-old defendant that requires us to find that it constitutes an expression of his right to remain silent. See *Fare* v. *Michael C.*, 442 U.S. 707, 724 (1979). Such a request may be taken into account when evaluating whether defendant had in fact made a voluntary and knowing waiver of his Fifth Amendment right to be free from compelled self-incrimination. In the absence of further evidence, however, in the circumstances as they appear here, even if defendant intended to invoke

---

[4] Defendant argues that the United States Supreme Court opinion *Dunaway* v. *New York*, 442 U.S. 200 (1979), is controlling. We disagree. In *Dunaway* the Court found that the defendant "was 'seized' in the Fourth Amendment sense when he was taken involuntarily to the police station." *Id.* at 207. The *Dunaway* Court did not, however, discuss the issue, that is controlling in our case, of whether defendant's consent to accompany the police was voluntary. Rather, the Court simply noted that both the county court and appellate division treated the case as an involuntary detention. *Id.* at 207 n.6.

his Fifth Amendment rights by such a request, we do not find that it constituted an invocation of his right to silence. See *United States ex rel. Riley* v. *Franzen,* 653 F.2d 1153, 1158-59 (7th Cir. 1981); see also *Fare,* 442 U.S. at 724 (in absence of further evidence that defendant's request to speak with probation officer was intended to be invocation of right to silence, the United States Supreme Court will decline to treat it as such).

We also find that defendant's request to see his father was not an invocation of his right to an attorney. In *Miranda* v. *Arizona,* 384 U.S. 436 (1966), the United States Supreme Court stated that, during a custodial interrogation, if the defendant "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." *Id.* at 444-45. Defendant asks us to significantly extend this rule by providing that a request for his parent, by a defendant who is over the age of 18, has the same effect as a request for an attorney. We decline to do so.

The rule enunciated in *Miranda*

> was based on [the United States Supreme] Court's perception that the lawyer occupies a critical position in our legal system because of his unique ability to protect the Fifth Amendment rights of a client undergoing custodial interrogation. Because of this special ability of the lawyer to help the client preserve his Fifth Amendment rights once the client becomes enmeshed in the adversary process, the Court found that "the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system" established by the Court.

*Fare* v. *Michael C.,* 442 U.S. at 719 (quoting *Miranda,* 384 U.S. at 469). Thus, the "rigid rule" fashioned in *Miranda* that a request for an attorney is per se invocation of Fifth Amendment rights is based on the unique role the lawyer plays as "the one person to whom society as a whole looks as the protector of the legal rights of that person in his dealings with the police and the courts." *Id.*

A parent who is not a lawyer and who is not trained in the law "is not in a position to offer the type of legal assistance necessary to protect the Fifth Amendment rights of an accused undergoing custodial interrogation . . . ." *Id.* at 722. We "cannot transmute the relationship between [the parent and an adult child] into the

type of relationship between attorney and client that was essential to the holding of *Miranda*" simply because, as defendant argues, his father was his normal source of advice and assistance. See *id.* at 723. Thus we decline to find that defendant's request to see his father was an invocation of his Fifth Amendment right to an attorney.

## D.

Defendant next argues that the trial court erred by employing an inappropriate standard of proof at the pretrial suppression hearing. The trial court used a "preponderance of the evidence" standard to determine the admissibility of defendant's confession. We note that defendant raises this issue for the first time on appeal. Nowhere in the proceeding below did defendant challenge the standard employed to determine whether there was a valid waiver of his right to counsel. This Court has repeatedly held that, "[w]here alleged error is not raised before the trial court, this Court will not ordinarily address it unless the circumstances indicate a plain error has occurred." *State v. Paquette,* 146 Vt. 1, 4, 497 A.2d 358, 361 (1985) (citation omitted); see *State v. Emilo,* 145 Vt. 405, 410, 491 A.2d 341, 344 (1985); *State v. Mecier,* 145 Vt. 173, 177, 488 A.2d 737, 740 (1984); V.R.Cr.P. 52(b). Assuming that the standard employed by the trial court is error at all, we do not find it "so grave and serious that it strikes at the very heart of the [defendant's] constitutional rights," *State v. Morrill,* 127 Vt. 506, 511, 253 A.2d 142, 145 (1969); it does not constitute plain error. The claim was waived and consequently we will not address it.

## VI.

We consider next defendant's claim that his due process rights were violated by the cross-examination of Dr. Woodruff's testimony concerning a "trance state" defendant said he was in at the time of the shooting. He argues further that the State improperly impeached the defense witness with evidence that defendant failed to give an exculpatory explanation during his confession. In addition, he urges us to find that in his closing statement to the jury the prosecutor argued improperly that the only evidence of the trance was defendant's statements to the

psychiatrist, made three months after the shooting and in preparation for trial.

Defendant relies principally upon *Doyle v. Ohio*, 426 U.S. 610 (1976), and *Wainwright v. Greenfield*, 474 U.S. 284 (1986), in support of his argument. In *Doyle* the United States Supreme Court held that, once *Miranda* warnings have been given, "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Doyle*, 426 U.S. at 618 (footnote omitted). In *Wainwright*, the United States Supreme Court went on to explain that "[t]he source of the unfairness was the implicit assurance contained in the *Miranda* warnings that silence will carry no penalty." *Wainwright*, 474 U.S. at 290 (footnote omitted).

In this case, defendant did not eventually invoke his right to remain silent, but he chose to speak to the police and confess to the killing. Thus, the prosecutor did not penalize defendant for exercising his Fifth Amendment rights; he never asserted those rights. "Once a defendant decides to speak, [his] failure to speak in exculpation cannot be explained away as a responce to *Miranda* warnings." *State v. Kane*, 432 A.2d 442, 444 (Me. 1981); see *Hill v. United States*, 404 A.2d 525, 531 (D.C. App. 1979), *cert. denied*, 444 U.S. 1085 (1980). This Court has held that a "defendant is not required to provide an exculpatory explanation to law enforcement officers." *State v. Mosher*, 143 Vt. 197, 204, 465 A.2d 261, 265 (1983). Thus, " '[t]he prosecution may not . . . use at trial the fact that he stood mute or claimed his privilege in the face of accusation.' " *Id.* at 204, 465 A.2d at 265 (quoting *Miranda*, 384 U.S. at 468 n.37); see *State v. Percy*, 149 Vt. 623, 626-29, 548 A.2d 408, 409-11 (1988). However, where defendant has chosen not to remain silent, the prosecutor may comment to the jury, and use for impeachment, inferences from the statements which he made of his own volition. See *Kane*, 432 A.2d at 444. As the United States Court of Appeals for the First Circuit has explained:

> A defendant cannot have it both ways. If he talks, what he says or omits is to be judged on its merits or demerits, and not on some artificial standard that only the part that helps him can be later referred to. This was not a case where the government commented upon . . . a prior exercise of rights.

The government asked the jury to measure what the defendant said when he had no rights because he had voluntarily waived them.

*Vitali* v. *United States,* 383 F.2d 121, 123 (1st Cir. 1967).

We find that the prosecutor's comments were proper attacks on the credibility of defendant's assertion to the psychiatrist that he was in a trance at the time of the killing, and were not impermissible comments on post-arrest silence. See *State* v. *Squires,* 147 Vt. 430, 431, 519 A.2d 1154, 1155 (1986).

## VII.

Defendant's final argument is that the trial court allowed inadmissible character evidence when it permitted the State to contest the issue of insanity with evidence of prior bad acts. The prosecution, on rebuttal, introduced evidence that defendant committed various unrelated crimes and engaged in other bad acts in order to disprove defendant's claim of insanity by establishing that he had an "antisocial personality disorder."

It is well established in Vermont that "[i]n matters of trial conduct and evidentiary rulings the trial court has wide discretion." *State* v. *Richards,* 144 Vt. 16, 19, 470 A.2d 1187, 1189 (1983); see *State* v. *Settle,* 141 Vt. 58, 62, 442 A.2d 1314, 1316 (1982). In the absence of an abuse of discretion we will not overturn the trial court's decision. *State* v. *Brown,* 147 Vt. 324, 328, 515 A.2d 1059, 1062 (1986).

In *State* v. *Smith,* 136 Vt. 520, 524, 396 A.2d 126, 128 (1978), this Court held that "the scope of relevant evidence as to sanity or insanity has to be allowed to be of whatever breadth is appropriate to fully expose the issue to the jury for their fair determination." Thus, a plea of insanity opens a broad inquiry that may include previous episodes of violent and antisocial behavior, so long as it has some connection to the issue of defendant's sanity. *Id.* at 524-25, 396 A.2d at 128.

In this case, defendant claimed he was suffering from a borderline personality which prevented him from being able to form the necessary intent for the crime charged. By doing so, defendant opened the door to a broad inquiry into his mental condition. Accordingly, the prosecution countered defendant's claim with expert testimony that he was suffering from a mental condition known as "antisocial personality disorder." In explaining how he

reached this conclusion, the prosecution's expert mentioned defendant's difficulties in interpersonal relationships and prior bàd acts. See V.R.E. 703. We cannot say that this evidence does not bear upon the issue of defendant's sanity, see *Smith*, 136 Vt. at 524-25, 396 A.2d at 128, and accordingly, do not find that the trial court abused its discretion by admitting this testimony.

*Affirmed.*

**Valente, Supr. J.**, Specially Assigned, dissenting. Under the circumstances of this case, the Supreme Court acted without jurisdiction when it ordered a change of venue from Chittenden to Lamoille County. As a result the Lamoille Superior Court lacked the power to hear the matter of *State* v. *Hunt*. For this reason, I respectfully dissent.

In considering the defendant's first claim of error, that the Vermont Supreme Court acted without jurisdiction, the majority opinion frames the question as being "whether the supervisory authority of the Supreme Court encompasses directing a change of venue to prevent a failure of justice." This is not the issue. The question presented is whether the Supreme Court, under the auspices of its superintending powers, may, on its own motion, assume jurisdiction over a matter not pending before it without providing notice and an opportunity to be heard to the litigants. Before addressing the issue of the Supreme Court's power to change venue in this matter, it must first be determined whether the Vermont Supreme Court had the power to even consider the case of *State* v. *Hunt*, Chittenden Superior Court Docket No. S-1-83CnCr.

I agree with the majority that the Supreme Court has superintending powers. What I cannot agree with is the exercise of these powers under the circumstances presented in this case. The fact that the Supreme Court has superintending control over inferior courts does not by itself mean that they have original jurisdiction over matters pending in those courts. The doors of supervisory jurisdiction open only when certain conditions are met. The law annotations and cases on the subject fail to reveal a single case where a higher tribunal exercised its supervisory powers on its own motion. See Annotation, *Superintending Control Over Inferior Tribunals*, 112 A.L.R. 1351 (1938); Annotation, *Superintending Control Over Inferior Tribunals*, 20 L.R.A. (N.S.) 942 (1909);

Annotation, *Superintending Control and Supervisory Jurisdiction of the Superior Over the Inferior or Subordinate Tribunal*, 51 L.R.A. 33 (1901). In each instance, at least one of the parties to the controversy in question made application to the court. Furthermore, of the many cases reviewed, there is not a single instance where the litigants were not afforded their due process rights of notice and an opportunity to be heard.

I, in dissent, believe that the Vermont Supreme Court did not have the power to consider the case and, therefore, acted without jurisdiction when it ordered a change of venue from Chittenden to Lamoille County. Since an order of a court without jurisdiction is void as lacking any basis in law, *Soucy* v. *Soucy Motors, Inc.*, 143 Vt. 615, 620, 471 A.2d 224, 227 (1983), the order of the Vermont Supreme Court changing venue was void. Thus, the Lamoille Superior Court never properly obtained jurisdiction over the matter of *State* v. *Hunt*.

The majority opinion holds that the Supreme Court's failure to afford the defendant due process when it ordered a change of venue may have been a violation of his constitutional rights, but that it was harmless error. Since the error was not in changing venue, but rather was in exercising jurisdiction in the first instance, the doctrine of harmless error does not apply. See *Soucy*, 143 Vt. at 620, 471 A.2d at 227. Therefore, I would hold that because the Lamoille Superior Court never properly obtained jurisdiction, the conviction of the defendant is void.

For the reasons stated herein, I would reverse and remand the case for trial before the Chittenden Superior Court.