*Russell v. Pallito*, No. 321-5-13 Wncv (Teachout, J.,  February 4, 2015)

[The text of this Vermont trial court opinion is unofficial.  It has been reformatted from the original.  The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

| | |
|---|---|
| **SUPERIOR COURT** | **CIVIL DIVISION** |
| **Washington Unit** | **Docket No. 321-5-13 Wncv** |

**ELLIOT RUSSELL,**
　　　**Petitioner**

　　　**v.**

**ANDREW PALLITO, Commissioner,**
**Vermont Department of Corrections,**
　　　**Respondent**

### DECISION AND ORDER
### Cross-Motions for Summary Judgment

Petitioner is a prison inmate who seeks Rule 75 review of a disciplinary determination that he engaged in conduct which disrupts the orderly running of the facility.  The issues are whether the procedures related to the hearing process satisfy due process requirements, and if so, whether sufficient evidence was presented at the disciplinary hearing to support the determination.  The case is now before the court on cross-motions for summary judgment.

There is no dispute as to the material facts.

### Material Facts

At the time of the incident, Petitioner was a Vermont inmate in the custody and control of the Commissioner of the Department of Corrections (DOC) serving his sentence at the Lee Adjustment Center in Beattyville, Kentucky.  Petitioner was participating in the prison's Adoptable Canine program, in which inmates work one-on-one with shelter dogs, training them for adoption into permanent homes.

On Friday, April 5, 2013, Petitioner was told by the head of the Adoptable Canine program, Donnie Edwards, to bring the dog he was training to the office.  Mr. Edwards took the leash and told Mr. Russell that he was being dismissed from the program for mistreating his dog.  Mr. Edwards must have told Mr. Russell that it was based on what Mr. Edwards had seen on a videotape of Mr. Russell and his dog, because Mr. Russell, who has consistently denied ever abusing any dog at any time, asked to see the video.  This request was denied as it is standard practice not to show inmates prison videotape for security reasons.

That same day at about 5:30 Mr. Russell received a Notice of Hearing for a hearing to take place on April 10, 2013 based on a charge of "conduct which disrupts the orderly running of the facility."  The Staff Witness Statement signed by Mr. Edwards on April 5th stated that the "Date/Time of Incident" was "4-5-13 about 3:00."  The content of the Statement is "Myself and James Combs was reviewing Pelco Camera and inmate Elliott Russell 331735 mistreating his dog."  The Inmate Disciplinary Report signed by Mr. Edwards identifies the "Date/Time of

Incident" as 4/5/13 / 1430." The evidence shows that the information given to Mr. Russell charges him with mistreating his dog on April 5th at 2:30-3:00 pm.

A disciplinary hearing was held on April 11, 2013. Petitioner testified that he had never mistreated this dog or any other. Both the hearing officer, Sergeant Johnny Peters, and the prison presenter, Gran McIntosh, identified the date of the incident as Friday, April 5. The head of the Adoptable Canine program, Donnie Edwards, also testified. He had not witnessed the incident but had viewed the videotape taken of the incident. His testimony was as follows:

> Well, we saw Mr. Russell come into, coming into O wing and, uh, the dog that he had turned around and was like going to follow another inmate out so Russell grabs his dog and is like wrestling with it on the floor. And he had his back kind of to the camera and we saw his arm go up and like he was going to hit the dog but we never see, we never saw the blow because when his arm was up he came down with it but we couldn't tell whether he hit the dog or not. And then he kept on wrestling with the dog and then he picks the dog up and then he walks up and goes into his cell with it.

Mr. Russell then called as witnesses two inmates who were also participants in the Adoptable Canine program. Both testified that they had never witnessed Mr. Russell being abusive toward a dog.

The first one was asked by the prison presenter, "Was you there, at the present when he supposedly done this?"

Witness: "Uh, when was this?"

Prison presenter: "Friday."

Hearing officer: "April 5, out there in the foyer in the hallway door, going to O wing."

The second inmate testified that the dog developed a bump on his head on Saturday, the day after the Friday that the dog was given up. Mr. Russell, when given an opportunity to question the inmate, stated: "The question I wanted to ask is they're saying that on Friday, April 5, that I had abused my dog. And, uh, can you tell me what time they said this happened? About 3:00? At about 3:00 on Friday or any other time before then, have you ever witnessed me being physically abusive to my current dog or any dog before then?" The witness said no.

When asked by the inmate legal assistant to describe Mr. Russell's arm action more specifically, including whether it seemed like a violent blow, Mr. Edwards stated that there was only one arm movement and that "You could tell by the way that it was on the camera from we could see that it was, but you know we didn't see the end of the blow. . . . We just seen his arm come down."

Then Mr. Edwards was asked further questions by the inmate's assistant, including whether Mr. Edwards had seen Mr. Russell hit the dog. Mr. Edwards acknowledged that he had not seen it.

The hearing officer then asked, "Anybody else got any other questions?" At that point Mr. Russell said, "The thing I want to know, is what time on Friday are you saying that this happened?"

Mr. Edwards responded, "Well it wasn't Friday that it happened. We checked the PELCO tape and it was on March 26 around, around 8:30." Mr. Russell followed up with: "In the morning or. . .?" Mr. Edwards: "In the night." Mr. Edwards then proceeded to talk about having taken the dog to the vet on three occasions, including the day before the hearing and the dog had a hematoma that was "from a awful hard lick in the head." He further stated that the vet said it would take 4-5 days for the injury to come up.

Mr. Russell then sought to clarify the time line with Mr. Edwards:

Mr. Russell: "Okay, now you saying, you said it would take three to four days for that to happen. From what Mike Lewis testified to, he said he didn't see the lump until Saturday April 6. So what you're saying is is that you seen, you saw me hit the dog on March 26. That's a full, uh, that's about 12 days. . ."

Mr. Edwards: "No, we didn't. I didn't say that that's when that happened. . .I'm saying that I seen you abuse the dog on March 26. . .but the, but the lick could have come after that."

Mr. Russell: ". . .I just want to know, did you physically see me abuse that dog?"

Mr. Edwards: ". . .And the thing, and I want to add too that I've had several reports through the staff that Mr. Russell has been abusive and has, and has been hard on the dogs." The hearing officer immediately stated that such a statement could not be used as part of the evidence. Mr. Russell then requested that the video be preserved.

After a recess, the hearing officer announced that Mr. Russell was convicted of a B-21 violation for holding down his dog and raising his right arm in a striking motion and assessed a penalty of 11 days of disciplinary segregation. Mr. Russell was told he had seven days to appeal.

He appealed, and the Superintendent upheld the determination on April 23, 2013 with the following explanation: "Although the camera did not capture footage of the actual contact between your hand and the dog due to its angle, it did get images of your arm in a striking motion and the dog had injuries consistent with being struck in this way. . . ." The video was not preserved. It was taped over by the end of April.

### Conclusions of Law

Mr. Russell challenges the conduct of the notice and hearing on procedural grounds based on standards required by the United States Constitution, the Vermont Constitution, 28 V.S.A. § 852(b)(1), (2), (3), and (5), and DOC Facility Rules and Inmate Discipline Rule 410.01. One specific claim is that Mr. Russell did not have "advance written notice of the claimed violation," *Wolff v. McDonnell,* 418 U.S. 539, 563 (1974), to ensure that the accused can "marshal the facts in his defense and to clarify what the charges are, in fact," id. at 564.

The record of the hearing makes clear that based on the content of the hearing notice, all those involved other than Mr. Edwards assumed that the time of the alleged conduct was on Friday, April 5th, at about 3:00 pm. The prison counselor and the hearing officer both identified this as the date of the alleged offense, and Mr. Russell's testimony and examination questions show that he understood this to be the date of the alleged offense. Mr. Edwards did not give the correct date in his direct testimony, and he did not correct any of these three when they erroneously identified, during the testimony, the date as April 5th. It was only during the final wrap-up cross-examination opportunity that Mr. Russell had, when Mr. Russell questioned Mr. Edwards specifically about the exact time of the alleged conduct "on Friday" (April 5), that Mr. Edwards finally clarified that the video was taken March 26th, ten days earlier.

There might be some circumstances in which the correction of an incorrect date late in a hearing is not prejudicial to an accused, specifically when what is at issue is an event that everyone recognizes took place although they may disagree about exactly what happened. In this case, it was prejudicial as a matter of fair procedure for several reasons.

First, Mr. Russell did not know what event was shown on video. It did not show an incident known to Mr. Russell, but footage from a routine security camera. The record is clear that Mr. Russell did not have an opportunity to see what the video showed or learn in advance what occurrence it captured. Even though there was a valid reason for him not to see it, without at least a description of what it showed, Mr. Russell could not respond to the accusation in a meaningful way.

Second, the notice given to Mr. Russell was affirmatively misleading. It identified a specific date and time for the alleged wrongful conduct—Friday, April 5 at 3:00 pm—which was 10 days later than the actual date of the alleged wrongful conduct. This prejudiced Mr. Russell in that he did not have the opportunity to prepare for the hearing by (a) knowing what date to think back to in an effort to recall his own version of what occurred and (b) being able to call relevant witnesses.

Third, Mr. Edwards sought to corroborate mistreatment that he inferred from what he saw on the video with evidence of an injury described by a vet of which Mr. Russell did not have notice and could not have related to the alleged wrongful conduct because of the gap in time. If the alleged conduct had occurred on April 5, the vet's description of a hematoma that took 4-5 days to develop and was a hematoma lanced on April 10 would have been powerful corroborating evidence of injury inflicted on a dog on April 5th. But if the alleged conduct was on March 26, there was insufficient evidence to link a blow on that date to a hematoma that was lanced on April 10.[1]

Thus, for the corroborating evidence to have any relevance at all, the exact date was important. It was not until late in the hearing, after all witnesses had given both direct and cross-examination testimony and Mr. Russell was asking a final cross-examination question about the

---

[1] While the testimony of Mr. Edwards provides some evidence of at least a threatening violent gesture to a dog on March 26th, which may be disruptive to the orderly operation of the dog training program within the facility, there is no evidence of a link between March 26 conduct and a hematoma injury to the dog within a 4-5 day time frame from that date. There was also no evidence of any blow that would have produced a hematoma on either April 6 or April 10.

specific time of the alleged conduct, that he was finally informed that the accurate date of the alleged conduct was 10 days earlier than he had been given to understand. If Mr. Edwards sought to rely on the dog's hematoma on April 10th as evidence of mistreatment, Mr. Russell had no advance notice of that allegation at all.

The DOC argues that because Mr. Russell testified that he never abused any dog at any time, his testimony presumably would have been the same had the date of the alleged offense been correctly identified, and thus there is no prejudice. Constitutional violations are subject to the harmless error rule. *State v. Hunt*, 150 Vt. 483, 489-90 (1988). Under this standard, the court may find an "error harmless only if we can state a belief that the error was harmless beyond a reasonable doubt." *State v. Jackowski*, 2006 VT 119, ¶ 8, 181 Vt. 73. In this case, it is not reasonable to presume that Mr. Russell's defense would have been the same andr no more successful, had he known the correct date of the alleged offense. The court cannot find beyond a reasonable doubt that the failure to provide accurate written notice was harmless. For this reason, his conviction must be vacated

The question, then, is whether the DR should be expunged or whether this case should be remanded for a new hearing at which Mr. Russell has proper notice and a fair opportunity to defend. The sole evidence against Mr. Russell was the video footage that no longer exists. The court has no way of knowing whether the few witnesses who saw that footage remain available to testify as to what they observed. If not, expungement is the only fair outcome in this case. If such witnesses are available and remain able to competently testify, and the DOC decides to proceed with a new hearing, then the lack of the videotape is not necessarily prejudicial. Mr. Russell would not be entitled to view the videotape and his appeals from any conviction would not require the reviewing authority or this court to view the videotape.

Accordingly, Petitioner's Motion for Summary Judgment is *granted*. Respondent's Motion for Summary Judgment is *denied. This case will be remanded to the DOC, which has discretion to expunge Mr. Russell's DR or proceed with a new hearing based on the charge of abuse alleged to have occurred on March 26, 2013.*

## ORDER

Attorney Lancaster shall prepare a Judgment based on this decision.

Dated at Montpelier, Vermont, this _____ day of February, 2015.

_____
Hon. Mary Miles Teachout
Superior Court Judge