NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2017 VT 20

No. 2014-281

State of Vermont | Supreme Court

| On Appeal from
v. | Superior Court, Chittenden Unit,
| Criminal Division

Richard E. Ladue | December Term, 2015

Kevin W. Griffin, J. (motion to suppress and dismiss);
Michael S. Kupersmith, J. (final judgment)

Thomas Donovan, Jr., Chittenden County State's Attorney, Benjamin Chater and
  Christopher C. Moll, Deputy State's Attorneys, and Devin Ringger, Law Clerk, Burlington,
  for Plaintiff-Appellee.

Matthew Valerio, Defender General, and Marshall Pahl, Appellate Defender, Montpelier, for
  Defendant-Appellant.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1. **DOOLEY, J.** Defendant appeals his conviction for driving under the influence (DUI), arguing that: (1) the State's principal witness testified on a matter that violated the trial court's pretrial ruling granting defendant's motion in limine; (2) the court erred in overruling defendant's objection to the prosecutor eliciting testimony from the State's principal witness that defendant never reported to police that he was not driving his vehicle on the night in question; (3) the prosecutor made several impermissible statements during his opening statement and closing argument regarding defendant's failure to inform police that he was not the driver; and (4) in attempting to define the term "reasonable doubt," the court diminished the constitutional

burden of proof imposed on the State, thereby committing structural error that requires reversal of defendant's conviction. We affirm.

## I. Facts and Procedural History

¶ 2. With some notable exceptions, the facts are largely undisputed. At approximately 11:05 p.m. on January 27, 2014, Officer Richard Weinisch was dispatched to a residence in Burlington to investigate a report of a hit-and-run accident. A woman at the residence reported hearing a crash and seeing a late 1990s silver-colored Honda with loud exhaust backing away from a Subaru wagon that had been damaged. After looking for the Honda, Officer Weinisch returned to the scene of the accident and observed a silver Honda parked nearby. The witness to the accident identified the vehicle as the one involved in the accident. Officer Weinisch ran the license plate number through dispatch, identified defendant as the registered owner, and proceeded to defendant's listed address.

¶ 3. When Officer Weinisch arrived at that residence, he spoke to defendant's mother, who informed him that defendant was not home. Officer Weinisch left the residence, but as he was entering his patrol car parked across the street, he observed the same silver Honda turn into the driveway of the residence. Officer Weinisch proceeded up the driveway on foot as the car pulled into a parking space at the end of the driveway to the left, close to the rear of the residence. According to Officer Weinisch's trial testimony, the first question he asked defendant, in investigating the hit-and-run accident, was whether anybody else had driven his car that night, to which defendant replied, "no." Officer Weinisch did not notice any visible damage to the car, and defendant denied any knowledge of the accident.

¶ 4. During the conversation, Officer Weinisch observed that defendant's eyes were bloodshot and watery and that there was a strong odor of alcohol emanating from his breath. Upon inquiry, defendant advised the officer that he had consumed three alcoholic drinks earlier in the evening. Suspecting that defendant was impaired, Officer Weinisch asked him to perform

2

field dexterity exercises, to which defendant agreed.  Based on his experience and training, the officer concluded that defendant did not successfully perform the exercises.  Defendant then agreed to submit a preliminary breath test (PBT), which revealed a blood-alcohol concentration (BAC) of .150, nearly double the legal limit.  At that point, Officer Weinisch arrested defendant and brought him to the police station for DUI processing, where at 12:45 a.m. defendant produced a breath sample indicating a BAC of .122.

¶ 5.    During the processing interview, defendant stated that he drove his vehicle from the site of the hit-and-run accident into the driveway of his mother's residence, where he was confronted by Officer Weinisch.  Defendant signed a form acknowledging that he made those statements to the interviewing officer.

¶ 6.    On February 11, 2014, defendant was charged with DUI, first offense.  Defendant filed a motion to suppress, claiming that there was no legal basis for the stop that resulted in his arrest for DUI.  Following an April 16, 2014 hearing, the trial court denied the motion.  A jury trial was held on May 21, 2014.  At the trial, defendant, his mother, and his cousin all testified that defendant's cousin, and not defendant, was driving defendant's car on the night in question.  Following the presentation of evidence, the jury found defendant guilty.  Defendant moved for a new trial, arguing that two questions the jury posed to the trial court after it retired to deliberate indicated that it had switched the burden of proof from the State to defendant.  The court denied the motion and later sentenced defendant to six-to-twelve months incarceration, all suspended, with a probationary term under special conditions.

II. Testimony Concerning the Horizontal Gaze Nystagmus Test

¶ 7.    Defendant first argues that the State's principal witness, Officer Weinisch, testified about a matter in violation of the trial court's grant of defendant's pretrial motion in limine, and that the testimony prejudiced him.  We conclude that any error in admission of the testimony was harmless.

3

¶ 8. On the morning of the trial, defense counsel stated that she had some motions in limine, the first of which was to preclude Officer Weinisch from testifying about the horizontal gaze nystagmus (HGN) test that he had given defendant "because he's not qualified as an expert to do so." The State responded, "That's fine," and the court stated, "Okay." Later, during the direct examination of Officer Weinisch, the prosecutor asked the officer what he did after he observed that defendant exhibited indicia of intoxication, to which the officer replied: "The first thing I did was the horizontal gaze nystagmus test in the driveway." The prosecutor immediately asked the officer what other tests he had defendant perform, at which point the testimony focused on the other two field dexterity exercises and defendant's poor performance of those exercises. The prosecutor later asked Officer Weinisch if he formed an opinion as to defendant's level of intoxication based on his observations of defendant and defendant's performance of the exercises. The officer stated that he believed defendant to be over the legal limit to operate a vehicle, but that, to "elaborate further . . . I'd have to refer to the HGN, which I believe we're not doing."[1]

¶ 9. Defendant argues that this testimony, particularly this last response by Officer Weinisch, constituted reversible error because a BAC above .08 creates only a permissible inference of impairment, see 23 V.S.A. § 1204(a)(2), and does not preclude a jury from relying on other evidence to find impairment, id. § 1204(b). We find no reversible error. State v. Kinney, 2011 VT 74, ¶ 6, 190 Vt. 195, 27 A.3d 348 ("[E]rror in the admission of evidence does not compel reversal of a criminal conviction where it is clear beyond a reasonable doubt that the

---

[1] Defendant did not object to either response in which Officer Weinisch mentioned the HGN test. "Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal." V.R.E. 103(a)(2). But when the trial court makes "only a preliminary ruling denying defendant's motion in limine to exclude the testimony," then a defendant must object to the testimony at trial when it is presented. See State v. Brink, 2008 VT 33, ¶ 7, 183 Vt. 603, 949 A.2d 1069 (mem.). We assume, without addressing the question, that the State's agreement not to present testimony about the HGN, and the trial court's acknowledgment of that agreement, precluded the need for a later objection when Officer Weinisch testified about the HGN test.

error was harmless, considered in light of the strength of the State's case apart from the offending evidence and the strength of the offending evidence itself.").

¶ 10. In this case, the offending evidence had virtually no strength at all, while the State's evidence of defendant's impairment was very strong. Although it was the State's burden to prove impairment beyond a reasonable doubt, defendant did not challenge the notion that he was impaired, instead focusing exclusively on his claim that he was not driving his car. For its part, the State presented substantial, unchallenged evidence as to defendant's impairment. Officer Weinisch testified that defendant's eyes were bloodshot and watery and that a strong odor of alcohol emanated from his breath. The officer also testified, without objection, as to defendant's failure to successfully perform two field dexterity exercises. Moreover, defendant's evidentiary breath sample was well over the legal limit. Given this evidence of impairment, Officer Weinisch's brief referral to the HGN test, even given the suggestion that the results of the test indicated impairment, was harmless beyond a reasonable doubt.

### III. Testimony Concerning Defendant's Silence Before Trial

¶ 11. Next, defendant argues that the trial court erred in overruling his objection to the prosecutor's final question on redirect examination of Officer Weinisch, which elicited a response that defendant never contacted police regarding his claim that he was not the driver on the night in question. Again, we conclude that any error in the admission of this testimony was harmless, if error at all.

¶ 12. The exchange at issue was as follows:

> PROSECUTOR: And one final question, Officer. In the three months following this investigation, did the defendant or any of the defendant's friends or relatives, ever call you or the Burlington Police Department, to your knowledge, to indicate that somebody else was driving that night?
>
> DEFENSE COUNSEL: Your Honor, I'm going to object with this question as it respects [defendant], as I believe it suggests to the jury that he had some obligation, which—

5

THE COURT: No—

DEFENSE COUNSEL: —under the Fifth Amendment, he does not have.

THE COURT: No, the objection is overruled.

PROSECUTOR: Can you answer the question?

OFFICER WEINISCH: So at no point in time from the beginning of my investigation that night through today, did anybody including defendant ever tell me that he was not driving that vehicle.

¶ 13.    In a one-paragraph argument, defendant asserts that admission of evidence of his silence was error, citing the U.S. Supreme Court's decision in Doyle v. Ohio, 426 U.S. 610 (1976) and this Court's reliance on that decision in State v. Mosher, 143 Vt. 197, 465 A.2d 261 (1983).  This due process claim is made pursuant to the Fifth and Fourteenth Amendments of the U.S. Constitution,[2] and thus federal law, and most particularly U.S. Supreme Court case law, is controlling.

¶ 14.    We conclude that defendant's reliance upon Doyle and Mosher is misplaced, given the circumstances of the instant case.  But before examining the relevant case law, we emphasize two points.  First, as we explain in detail in considering defendant's third argument challenging statements made by the prosecutor during his opening statement and closing argument, the State was aware that the defense witnesses, including defendant, were going to testify at trial that defendant was not driving his car on the night in question.  Second, although the challenged testimony technically came in during the State's case in chief, it was admitted on redirect examination, essentially to rehabilitate the principal witness, Officer Weinisch, following defendant's cross-examination of the officer.  Cf. State v. Chambers, 144 Vt. 377, 380,

_____

[2]  In relevant part, the Fifth Amendment provides that no person "shall be compelled in any Criminal Case to be a witness against himself [or herself] . . . without due process of law." U.S. Const. amend. V.  In relevant part, the Fourteenth Amendment provides that no state "shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV, § 1.

6

477 A.2d 974, 977 (1984) (concluding that where defense counsel cross-examined prosecution's witness about letter witness had written to defendant and used statements in letter to impeach witness, defense opened door for prosecution to rehabilitate its witness through redirect examination); State v. Settle, 141 Vt. 58, 62, 442 A.2d 1314, 1316 (1982) ("Whatever effect the cross-examination may have had on the jury in weakening the impact of [the witness's] initial identification [of the defendants], the State was properly allowed on redirect, in the discretion of the trial judge, to meet what had been developed on cross-examination, to explain away any tendency to discredit [the witness] that may have been accomplished.").

¶ 15. During the course of what amounts to twenty-three pages of transcript, Officer Weinisch testified on direct examination as to what occurred on the night in question, including that: (1) he told defendant's mother that defendant's car may have been involved in an accident and that defendant needed to call him so he could determine who, if anybody, had been driving defendant's car; (2) a few minutes later, as he walked up the driveway behind defendant's car, which had just pulled in, he lost sight of the front of the car for "two, three seconds"; (3) as he approached defendant's car, he observed defendant exiting the driver's seat from a seated position and saw no one else get out of the car; (4) the first thing he asked defendant—in connection with the reported accident and before he observed any indicia of intoxication—"was if anybody else had been driving his vehicle that night"; (5) defendant responded "no" to that question; (6) during the ensuing discussion, he observed indicia of intoxication, and his suspicion that defendant had been driving while intoxicated was confirmed by results of the field dexterity exercises defendant performed and the preliminary breath test defendant provided; (7) he then arrested defendant and advised him, among other things, that he had a right to remain silent and to speak to a lawyer; (8) defendant waived those rights and decided to speak to him; and (9) in response to questions on the DUI affidavit form defendant signed, defendant indicated that he

had driven from the scene of the hit-and-run to his mother's home, where Officer Weinisch confronted him.

¶ 16.    At no time during this direct examination of Officer Weinisch—the State's only witness other than a state chemist who testified about the breath test result—did the prosecutor question the officer as to whether defendant had ever informed police after his arrest and DUI processing of his claim that his cousin had actually been the driver of the car.

¶ 17.    On cross-examination, defense counsel immediately attacked Officer Weinisch's reliability and credibility as to who was driving defendant's car that night.  Defense counsel got Officer Weinisch to acknowledge that he could not see who was driving the car while it was moving up the driveway toward the parking area behind the house.[3]  The following exchange then occurred:

> Q:  Okay.  And you did lose sight of the vehicle, I believe you said for a matter of two or three seconds?
>
> A:  I did.
>
> Q:  Okay.
>
> A:  Just the passenger compartment of the vehicle.  I could still see the . . . trunk area of the vehicle.  But . . . I could not see the doors of the vehicle.
>
> Q:  So you don't really know whether [defendant] was the only person in the car.
>
> A:  No.  I do.
>
> Q:  Well, you said that you couldn't see the whole vehicle and you lost sight of most of the vehicle for two to three seconds.
>
> A:  Two or three seconds, while the vehicle was pulling into a parking spot.
>
> Q:  So you don't know what happened during those two or three seconds, do you?

_____

[3]    During the April 16, 2014 motion hearing, the State presented Officer Weinisch's unchallenged testimony, which is apparent from exhibit photographs, that the driveway was about twenty yards long, at the end of which there were parking spots just to the left behind the house.

A: The vehicle parked.

Q: But you couldn't see it?

A: I could see the vehicle moving into a parking spot, so—

Q: You could not see the entirety of the vehicle. Is that what you testified before?

A: Yes.

¶ 18. In response to this line of questioning attacking Officer Weinisch's reliability and credibility as to who was driving defendant's car, the prosecutor attempted to rehabilitate the officer's prior direct testimony by asking him two questions on redirect examination: (1) whether he saw anybody else around defendant's car after he made contact with defendant; and (2) whether, to his knowledge, in the three months since that night, either defendant or his relatives called police to indicate that someone other than defendant had been driving defendant's car that night. It is the latter question, and defendant's response to that question, to which defendant objects.

¶ 19. As noted, defendant relies primarily on Doyle to support his claim of error. In that case, the U.S. Supreme Court considered "whether a state prosecutor may seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving Miranda warnings at the time of his arrest." 426 U.S. at 611 (footnote omitted). The Court held "that the use for impeachment purposes of petitioner's silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." Id. at 619 (emphasis added). The Court explained that because Miranda warnings contain an implicit assurance that silence will carry no penalty, in "such circumstances [where warnings are given], it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." Id. at 618.

9

¶ 20. The Court explicitly noted, however, that it was not considering if the prosecution's cross-examination of a defendant on his or her general pretrial silence regarding an exculpatory story presented at trial amounts to constitutional error, stating that such "averments of error present different considerations from those implicated by cross-examining . . . defendants as to their silence after receiving Miranda warnings at the time of arrest." Id. at 616 n.6; see United States v. Laury, 985 F.2d 1293, 1304 (5th Cir. 1993) ("However, Doyle did not decide whether comments on a defendant's failure to give an alibi anytime prior to trial is unconstitutional."). Thus, Doyle is plainly distinguishable from, and does not control, this case, where defendant is challenging the State's elicitation of testimony regarding defendant's general silence following an investigation in which he explicitly waived his Miranda rights and spoke to police about the same facts that defendant now asserts he had a right to silence.

¶ 21. Over the ensuing years, the U.S. Supreme Court has clarified, and in some respects narrowed, the scope of the holding in Doyle. On multiple occasions, the Court has reiterated that the Doyle holding "rests on the 'fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial.' " Wainwright v. Greenfield, 474 U.S. 284, 291 (1986) (quoting South Dakota v. Neville, 459 U.S. 553, 565 (1983)); see Brecht v. Abrahamson, 507 U.S. 619, 628 (1993) (same); see also Salinas v. Texas, ___ U.S. ___, 133 S. Ct. 2174, 2182 n.3 (2013) (citing Doyle for principle that due process "prohibits prosecutors from pointing to the fact that a defendant was silent after he [or she] heard Miranda warnings" (emphasis added)); Fletcher v. Weir, 455 U.S. 603, 607 (1982) (per curiam) ("In the absence of the sort of affirmative assurances embodied in the Miranda warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand."); United States v. Carter, 953 F.2d 1449, 1464 (5th Cir. 1992)

("Subsequent Supreme Court decisions have clarified that the Doyle protection derives primarily from the implicit assurance of the Miranda warnings and thus is strongest in the context of post-Miranda-warning interrogation."). Thus, the holding in Doyle does not bar cross-examination as to prior inconsistent statements made by the defendant "because a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent." Anderson v. Charles, 447 U.S. 404, 408 (1980).

¶ 22. As noted, in the instant case, defendant was given Miranda rights, but elected to waive them and speak to police. After doing so, he informed the officer during DUI processing that he had driven his car from the scene of the hit-and-run accident "into [the] driveway" of his mother's residence, where Officer Weinisch confronted him. At trial, however, he testified that he told Officer Weinisch at the time the officer confronted him in his driveway that he had not been driving his car—which is directly inconsistent not only with Officer Weinisch's testimony, but also with his statement to Officer Weinisch during DUI processing after waiving his Miranda rights, as reflected on a DUI statement form that defendant signed.

¶ 23. In Wainwright, in contrast to the instant case, the defendant exercised his right to remain silent after being read his Miranda rights. 474 U.S. at 286. The Court noted that the prosecution's use of a defendant's silence as affirmative proof of guilt in its case in chief "might thus be especially egregious because, unlike Doyle, there was no risk that exclusion of the evidence [would] merely provide a shield for perjury." Id. at 292 n.8 (quotation omitted). The same cannot be said of the instant case, where the State was responding to defendant's eleventh-hour denial at trial that he was driving his car that night, which was wholly inconsistent with statements defendant made after being given his Miranda rights on the night of his arrest. As we stated in State v. Hunt, "[o]nce a defendant decides to speak, [the defendant's] failure to speak in exculpation cannot be explained away as a response to Miranda warnings." 150 Vt. 483, 500, 555 A.2d 369, 380 (1988). Every defendant has the right to take the stand, but having

11

voluntarily done so, a defendant is "under an obligation to speak truthfully and accurately," and the prosecution may "utilize the traditional truth-testing devices of the adversary process." Harris v. New York, 401 U.S. 222, 225 (1971).

¶ 24. For similar reasons, we find unavailing defendant's reliance on State v. Mosher, which in turn relied upon Doyle. In Mosher, we found reversible error in the prosecution's use in its case in chief of the defendant's silence after being confronted with inculpatory evidence during a police interview. In that case, however, we concluded that the prosecution was foreclosed from presenting substantive evidence of the defendant's conduct at the end of the interview because the eighteen-year-old defendant "effectively reasserted" his Miranda rights, including his right to remain silent, by walking out of the interview. See Mosher, 143 Vt. at 203-06, 465 A.2d at 264-66. That situation is plainly distinguishable from this case, where defendant waived his Miranda rights, including his right to remain silent, before making statements inconsistent with his later trial testimony.

¶ 25. To be sure, in Mosher we found "no authority for the proposition that it is not error for the State to use defendant's silence as substantive evidence of guilt." 143 Vt. at 205, 465 A.2d at 266. But, as noted above, in Mosher we concluded that the youthful defendant had asserted his right to remain silent after being read his Miranda rights. Moreover, none of the cases cited by Mosher in support of its statement that "ample authority existed for the opposite proposition" involved a situation such as the instant one, in which defendant waived his Miranda rights, spoke to police, and then later asserted a defense at trial inconsistent with the statements made to police. Mosher, 143 Vt. at 205-06, 465 A.2d at 266; see United States v. Moore, 104 F.3d 377, 385 (D.C. Cir. 1997) ("While a defendant who chooses to volunteer an unsolicited admission or statement to police before questioning may be held to have waived the protection of that right, the defendant who stands silent must be treated as having asserted it."); United States v. Lopez, 575 F.2d 681, 684-85 (9th Cir. 1978) (finding plain but harmless error where

12

prosecutor improperly commented on defendant's failure to explain that shooting was accident); Egger v. United States, 509 F.2d 745, 747 (9th Cir. 1975) (finding harmless error where State's witness was allowed to testify that defendant refused to comment on whether he had knowledge of stolen bank money); United States v. Brinson, 411 F.2d 1057, 1060 (6th Cir. 1969) (finding error in allowing testimony regarding defendant's failure to deny accusations because "the question whether his silence has any incriminating effect depends upon whether he was under any duty or any natural impulse to speak"); United States v. Brierly, 384 F.2d 992, 993-94 (3d. Cir. 1967) (concluding that eliciting testimony that defendant clenched his lips and shook his head upon hearing accusations against him was fundamentally unfair); cf. Hunt, 150 Vt. at 500, 555 A.2d at 380 (distinguishing Mosher and stating that "where defendant has chosen not to remain silent, the prosecutor may comment to the jury, and use for impeachment, inferences from the statements which he made of his own volition").

¶ 26.    In short, neither Doyle nor Mosher are controlling, given the circumstances of this case.  In fact, no U.S. Supreme Court decision supports the proposition, as argued by defendant, that the prosecution cannot reference in its case in chief defendant's silence regarding an exculpatory defense leading up to trial where the defendant had waived his Miranda rights at the time of the arrest and made inculpatory statements inconsistent with that defense.  Nor does any decision support the proposition that the prosecution cannot present rehabilitative testimony regarding such silence on redirect examination following defense counsel's attack during cross-examination on the reliability and credibility of the prosecution's principal witness concerning the inconsistent exculpatory defense.  Indeed, neither proposition is supported by the rationale of Doyle and its progeny.

¶ 27.    The dissent contends that our affirmance of defendant's conviction violates "clear" and "plain" precedent prohibiting the prosecution from commenting on silence, as opposed to prior inconsistent statements.  Post ¶¶ 51, 61.  In fact, there is no such clear and plain

13

precedent. Indeed, the case law cited by the dissent in support of this proposition demonstrates that the right on which the dissent relies is far more conditional and limited than the dissent recognizes.

¶ 28. Several of the cases the dissent cites are distinguishable from the instant case because they involved situations in which the prosecution commented on silence when there were no prior inconsistent statements and/or no waiver of Miranda rights. For example, the dissent cites multiple times to United States v. Canterbury, 985 F.2d 483 (10th Cir. 1993), a case in which the defendant raised an entrapment defense at trial with respect to the charge of unlawfully possessing an unregistered firearm. The prosecutor cross-examined the defendant extensively as to why he did not inform police at the time he was arrested that he had been set up. The court found a Doyle violation because the defendant's "partial silence" after receiving Miranda warnings did not "preclude him from claiming a violation of his due process rights under Doyle" and because the few statements he made were "not inconsistent with his entrapment defense." Id. at 486; see also Laury, 985 F.2d at 1303 (finding Doyle violation where, although defendant made post-arrest statements to police, he did not say anything that "was inconsistent with" his alibi defense first raised at trial).

¶ 29. Another case cited by the dissent, Grieco v. Hall, 641 F.2d 1029 (1st Cir. 1981), reveals some of the limits on the right upon which the dissent relies. In that case, the defendant presented an exculpatory story at trial that was inconsistent with post-arrest statements he had made. The prosecutor vigorously cross-examined the defendant as to why he did not present the story to police at the police station after he was arrested. Rejecting the defendant's claim of a Doyle violation, the court noted that Doyle "does not establish a rule which gives rise to constitutional error in every case in which the prosecutor refers to the defendant's post-arrest silence." Id. at 1033. As the court stated, "once a defendant makes post-arrest statements that may arguably be inconsistent with the trial story, inquiry into what was not said at arrest may be

14

designed not 'to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement.' " Id. at 1034 (quoting Charles, 447 U.S. at 409).

¶ 30.    In this case, following his arrest, defendant told police during DUI processing that he had driven to his residence on the night in question.  As the U.S. Supreme Court stated in Charles: "Each of two inconsistent descriptions of events may be said to involve 'silence' insofar as it omits facts included in the other version.  But Doyle does not require any such formalistic understanding of 'silence'. . . ."  Charles, 447 U.S. at 409.  Here, the prosecutor's challenged question could be viewed as an attempt to "elicit an explanation for" defendant's statements at the time of his arrest that he drove his car, which were entirely inconsistent with his exculpatory story presented to the jury at trial.  Id.

¶ 31.    In any event, given the unique circumstances of this case, we need not determine if admission of the challenged testimony was error, insofar as we conclude that any error was harmless beyond a reasonable doubt.  As noted, "error in the admission of evidence does not compel reversal of a criminal conviction where it is clear beyond a reasonable doubt that the error was harmless, considered in light of the strength of the State's case apart from the offending evidence and the strength of the offending evidence itself."[4] Kinney, 2011 VT 74, ¶ 6; see Chapman v. California, 386 U.S. 18, 24 (1967) (holding that constitutional error is harmless where it can be "prove[d] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained").  As indicated above, the evidence of defendant's impairment was very strong.  The only defense to the DUI charge was defendant's after-the-fact "I was not driving" exculpatory story.  That story was not reasonably plausible—as suggested by the twelve minutes it took the jury to reach a guilty verdict—given the evidence presented in the case.  Cf. State v. Heller, 793 P.2d 461, 466 (Wash. Ct. App. 1990) (concluding that error in prosecutor's

---

[4]  We do not suggest, as the dissent implies, that this standard is the equivalent of determining whether the jury "could have" rendered a guilty verdict absent the claimed constitutional error.  Post, ¶ 63.

questioning of defendant regarding her failure to inform police of her exculpatory story before trial was not harmless error because "story was reasonably plausible and not facially unbelievable"); Canterbury, 985 F.2d at 487 (finding no harmless error because "this is not a case where the defendant's theory is 'transparently frivolous' and the evidence of guilt overwhelming" (citation omitted)).

¶ 32.   Officer Weinisch testified that in walking up the twenty-yard-long driveway behind defendant's car as it was pulling into the driveway, he lost sight of all but the rear of the car for only two to three seconds while the car turned into a parking spot behind the house. Moreover, Officer Weinisch testified that he actually observed defendant exiting the driver's seat of the car.  The jurors would have had to suspend disbelief to conclude that in those two to three seconds defendant got out of the passenger side of the car, ran around the front of the car, took the car keys from his cousin exiting the driver's seat (who was somehow unseen by the officer as he entered the residence), and then appeared to be getting out of the driver's seat as Officer Weinisch regained a full view of the car.

¶ 33.   Officer Weinisch also testified that defendant told him immediately after being confronted at the end of the driveway that no one else was driving his car that night.  When Officer Weinisch asked defendant if anyone else had driven his car, the officer was investigating the hit-and-run accident, not a DUI.  Defendant's response to the officer was consistent with the statements defendant made shortly thereafter during DUI processing after he waived his Miranda rights.  Thus, although defendant testified at trial that he told Officer Weinisch he was not the driver, this is not a pure credibility contest.  Cf. Kinney, 2011 VT 74, ¶¶ 12-13 (finding no plain error in prosecutor's comment regarding defendant's credibility as to who had been operating his ATV when it was stopped because "this was not a pure 'credibility contest' " in that "the circumstantial evidence that defendant was the operator of the ATV was overwhelming" (citation omitted)).

¶ 34. The most probative evidence on driver identity in this case, aside from Officer Weinisch's testimony, was defendant's own statement during DUI processing after waiving his Miranda rights indicating that he was driving his car on the night in question.[5] Evidence of defendant's silence regarding driver identity from that time until trial had little probative value— or potential prejudicial impact—and was merely cumulative with respect to the far more probative evidence of his reaction and statements immediately before and after his arrest and DUI processing. Cf. Brecht, 507 U.S. at 639 (concluding that prosecution's reference to petitioner's post-Miranda silence regarding circumstances of shooting were cumulative and thus had no substantial and injurious effect or influence in determining jury's verdict, given prosecution's "extensive and permissible reference[] to petitioner's pre-Miranda silence" regarding circumstances of shooting). Indeed, if the jurors had believed defendant's testimony that he told Officer Weinisch he was not the driver, evidence of his failure to later inform police of that fact would have had no probative value and no prejudicial impact.

¶ 35. Moreover, defendant's Doyle argument is essentially based on the timing of Officer Weinisch's challenged trial testimony. Defendant, as well as his mother and cousin, testified at trial that the cousin was driving defendant's car on the night in question—and defense counsel cross-examined those witnesses on that testimony without objection. The defense presented the testimony of defendant's cousin, defendant's mother, and then defendant, each of whom repeated on direct examination the same story—in the two to three seconds that the officer could not see the passenger compartment of defendant's car as it was pulling into the parking spot behind the house, defendant exited the front passenger seat of his car and went around the

_____

[5] The dissent seeks to downplay this evidence, which severely undercut defendant's story at trial that he was not driving his car. In response to the officer's questions asking defendant where he was driving from and to, defendant answered from Maple Street (the scene of the accident) into his driveway, thereby acknowledging that he was operating his vehicle on the night in question. The dissent states that these answers did not amount to an admission that he was operating his car at the time it was stopped. Even defendant does not make such an argument. Construing defendant's responses as not acknowledging he was driving his car would "artfully blur[] the facts." Post, ¶ 65, n.15.

front of the car to take his keys from his cousin, who had been driving the car but felt sick and rushed into the house to throw up. Apart from the question of how this could have happened in the two or three seconds that Officer Weinisch lost sight of the front of the car as it was pulling into the parking space, the story is directly inconsistent with Officer's Weinisch's testimony that he observed defendant exiting the driver's seat of the car. Defendant also testified—contrary to Officer Weinisch's testimony—that he told Officer Weinisch that his cousin had been driving the car and not him. But, as noted, that testimony was inconsistent with defendant's own statement made shortly after the stop during DUI processing that he was driving the car.

¶ 36. The prosecutor was entitled to cross-examine defendant by impeaching his prior testimony that he told Officer Weinisch he was not the driver that night. See Charles, 447 U.S. at 408 (stating that cross-examination inquiring into prior inconsistent statements "makes no unfair use of silence because a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent"); cf. United States v. Greer, 702 F.2d 651, 655 (7th Cir. 1983) ("Clearly, the state can cross-examine and comment when a defendant, prior to his arrest, did not come forward with the exculpatory story of his trial testimony when he had both the opportunity and good reason to do so."). Indeed, defendant did not object to the prosecutor's cross-examination of the defense witnesses, including defendant, regarding their version of what occurred that night. Cf. Jenkins v. Anderson, 447 U.S. 231, 234 (1980) (" 'Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here [in cross-examining defendant about not reporting his claim of self-defense to police after stabbing] did no more than utilize the traditional truth-testing devices of the adversary process.' " (quoting Harris, 401 U.S. at 225)); Carter, 953 F.2d at 1465 (concluding that prosecutor's questioning during cross-examination as to whether defendant had ever told police about his exculpatory story offered at trial was not commenting on defendant's refusal to submit to interrogation but rather "on the improbability that [the defendant] would

languish for two and a half months in jail in possession of information that might, upon investigation, have resulted in his release"). Following the close of defendant's case, the prosecutor could have offered essentially the same testimony that was objected to in the State's case in chief.

¶ 37. Because the only defense in this case was the "I was not the driver" defense, the jury was going to hear, through cross-examination of the defense witnesses, evidence of defendant's inconsistent contemporaneous statement that he was driving, as well as Officer Weinisch's rebuttal testimony. This is not a situation, like the one in Mosher, where defendant's decision to testify may well have been influenced by Officer Weinisch's answer to the one challenged question on redirect. See 143 Vt. at 207, 465 A.2d at 266-67 ("It may well be that [the defendant's] ultimate decision to testify was influenced by the fact that some of the most potentially damaging evidence against him had already come before the jury."). Furthermore, even if defendant had not testified, the evidence of defendant's inconsistent statements would have been admitted to rebut the testimony of defendant's mother and cousin. Cf. United States v. Caro, 637 F.2d 869, 876 (2d Cir. 1981) ("[E]ven if we thus assume arguendo that it was error for the Government to introduce evidence of [the defendant's] silence when it did, the error was harmless beyond a reasonable doubt because the evidence could subsequently have been introduced to rebut [the defendant's] testimony that he was shocked to see the counterfeit notes found in his suitcase.").

¶ 38. For all of the above reasons, we conclude that any error in allowing the challenged question on redirect examination of Officer Weinisch was harmless beyond a reasonable doubt.

19

¶ 39.   Defendant also argues that the prosecutor made a number of impermissible comments during his opening statement and closing argument.  Because defendant did not object to any of these comments at trial, we examine them for plain error.  State v. Fellows, 2013 VT 45, ¶ 16, 194 Vt. 77, 76 A.3d 608.  Comments made by the prosecutor during opening statement or closing argument "will not amount to plain error unless they are so manifestly and egregiously improper that there is no room to doubt the prejudicial effect."  Id. ¶ 20 (quotation omitted).  Defendant has not satisfied that rigorous standard here.

¶ 40.   Defendant first points, once again, to comments made by the prosecutor with respect to defendant's failure to tell police prior to trial that he was not driving his car on the night in question.  To fully explain why we find no plain error as to these comments, we set forth the origin of defendant's driver-identity defense and reiterate how it unfolded at trial.

¶ 41.   Defendant first raised the "I was not the driver" defense at a hearing on his motion to suppress held approximately one month before trial.  Although his motion was directed at the alleged unreasonableness of the stop, his principal trial defense became clear.  Towards the end of defense counsel's cross-examination of Officer Weinisch at the motion hearing, the officer explained the length and layout of the driveway and confirmed his previous testimony on direct examination that he saw only defendant exit defendant's car and that defendant told him that he was the only person who had driven the car that evening.  Defendant then presented the testimony of his mother, who stated, as she later did at trial, that defendant's cousin, not defendant, was driving defendant's car on the night in question.  The prosecutor cross-examined defendant's mother as to why she did not tell Officer Weinisch that defendant's cousin was driving the car the night of the accident.  On rebuttal, Officer Weinisch reiterated that defendant was the only person who exited the car, that defendant told him no one else had driven the car that evening, and that defendant never indicated that his cousin was driving the car.

20

Defendant neither objected to this testimony nor filed a motion in limine to exclude the testimony at trial.

¶ 42. Thus, one month later at the trial, the State was aware that defendant's three witnesses, including defendant, were going to testify that defendant had not been driving his car at the time of his encounter with Officer Weinisch. In his opening statement, the prosecutor explained to the jurors that he wanted to give them "some picture of the evidence" they were to hear that day. Toward the end of his statement, the prosecutor told the jury that defense witnesses were going to testify that in the few seconds that Officer Weinisch lost sight of defendant's car, notwithstanding that the officer would testify he observed defendant exit the vehicle, "somebody else actually jumped out of the driver's seat and ran inside the house before Officer Weinisch made it all the way up the driveway." The prosecutor then stated: "The evidence will show that neither on that night, nor in the months that have passed since the arrest, until about one month ago, at no time did the defendant or his mother call the Burlington Police Department to tell them that somebody else was driving." The prosecutor told the jury that it was their "job as jurors to assess the credibility of all of the witnesses you see here today."

¶ 43. Rather than objecting to any of these comments, defense counsel reiterated to the jurors in her opening statement that, as the prosecutor had just told them, they would hear inconsistent accounts of what happened on the night in question, and specifically, that they would hear why none of the defense witnesses reported to police that it was actually defendant's cousin who was driving that night.

¶ 44. During closing argument following the presentation of evidence, the prosecutor referred to Officer Weinisch's testimony that he observed defendant in the process of exiting the driver's seat and that defendant told him he had driven his car from the scene of the hit-and-run accident to his mother's house and that nobody else had driven his car that night. The prosecutor acknowledged the defense witnesses' exculpatory story, but stated: "You heard Officer Weinisch

21

testify that neither on that night nor in the months following the incident, did the defendant or any of defendant's family tell him that anybody besides the defendant was driving the vehicle." The prosecutor further acknowledged defendant's testimony that he told Officer Weinisch he was not driving that night, but noted that defendant did not complain to "the Burlington Police Department regarding the alleged misconduct of Officer Weinisch."

¶ 45. Again, given the unique circumstances of this case and for the reasons set forth above, we find no plain error in the prosecutor's comments. Although a suspect is not required to provide an exculpatory explanation to police, that does not mean that the State is "precluded from using a suspect's lack of explanation prior to arrest to rebut an explanation offered by the defense at trial." State v. Longley, 2007 VT 101, ¶ 26, 182 Vt. 452, 939 A.2d 1028; cf. Portuondo v. Agard, 529 U.S. 61, 69 (2000) (acknowledging prior case law prohibiting prosecutor's comments suggesting that silence was evidence of guilt, but citing "longstanding rule that when a defendant takes the stand, his credibility may be impeached and his testimony assailed like that of any other witness" (quotation omitted)); State v. Marshall, 334 P.3d 866, 871-72 (Kan. Ct. App. 2014) (stating that when defendant testifies at trial, " 'his credibility may be impeached and his testimony assailed like that of any other witness,' " and thus finding no Doyle violation where prosecutor commented during closing argument on defendant's failure to mention to police, until after DNA testing was done, that he was performing medically necessary procedure on sexual-assault victim (quoting Brown v. United States, 356 U.S. 148, 154 (1958))).

¶ 46. Defendant also cites as impermissible the prosecutor's comments suggesting to the jury that defendant did not want to be accountable for his actions and questioning what motivation Officer Weinisch would have for lying under the circumstances. The prosecutor's accountability statements were both extremely brief and followed immediately by a summation of the evidence regarding driver identity. As for the motivation comment, the prosecutor cited the evidence and asked the jurors to ask themselves what motive Officer Weinisch would have

22

had for indicating in his report that defendant had acknowledged he was driving if in fact he had told the officer that his cousin was driving. The prosecutor was suggesting that Officer Weinisch should be believed because of the evidence presented at trial—which included defendant's contemporary written acknowledgment of being the driver—not because he was a police officer. Immediately before summarizing the evidence, the prosecutor told the jurors that it was their "job as jurors to assess the credibility of all the witnesses you see here today. It's in your hands to decide what you believe and what you don't believe." Again, we find no plain error.

¶ 47. The other statements that defendant cites on appeal were the prosecutor's suggestions that defendant's membership in the Vermont National Guard and the fact that he lived with his mother and paid some of the household expenses may have motivated him and his mother to fabricate the story about the cousin driving. The prosecutor suggested, while acknowledging that he did not know, that defendant might be concerned about how a conviction could affect his status in the Vermont National Guard and that his mother might be concerned that a conviction could affect her son's support for the household.

¶ 48. Although defendant testified on direct examination that he was a member of the Vermont National Guard, and his mother testified that defendant lived with her and paid some household expenses, it was speculative for the prosecutor to suggest that these facts may have motivated them to fabricate the driver-identity story. See State v. Reynolds, 2014 VT 16, ¶ 16, 196 Vt. 113, 95 A.3d 973 ("The general rule is that counsel should confine argument to the evidence of the case and inferences that can properly be drawn from it." (quotation omitted)); State v. Billado, 141 Vt. 175, 183-84, 446 A.2d 778, 783 (1982) (stating that "it is not prejudicial to argue fabrication as long as the evidence supports the argument"). But these qualified comments "do not rise to the level of fundamental misconduct required by the 'plain error' standard." Reynolds, 2014 VT 16, ¶ 35.

¶ 49. "A defendant seeking reversal of a conviction based on an allegedly improper closing argument must show not only that the prosecutor's argument was improper, but also that it impaired the defendant's right to a fair trial." State v. Hemond, 2005 VT 12, ¶ 11, 178 Vt. 470, 868 A.2d 734 (quotations omitted). Defendant has failed to do that here. Cf. State v. Rehkop, 2006 VT 72, ¶ 38, 180 Vt. 228, 908 A.2d 488 (finding plain error, despite rigorous standard, where prosecutor attempted "to undermine the credibility of the defense witnesses by purporting to quote from transcripts not in evidence," by stating that "the defense witnesses lied under oath," and by representing "that he would have considered charging the defense witnesses with perjury").

## V. Reasonable Doubt Instruction

¶ 50. Finally, defendant argues that the trial court's attempt to define reasonable doubt by stating in part that the jury must have "great certainty"—as opposed to "utmost certainty"—amounted to structural error that requires reversal. We recently rejected the same argument with respect to the same instruction given by the same judge. State v. Levitt, 2016 VT 60, ¶¶ 5-13, ___ Vt. ___, 148 A.3d 204.

Affirmed.

FOR THE COURT:

_____

Associate Justice

¶ 51. **SKOGLUND, J., dissenting.** The majority improperly conflates a prosecutor's ability to impeach a defendant using the defendant's post-Miranda statements with prosecutorial comments intended to elicit meaning from a defendant's post-Miranda silence. No caselaw supports this conflation; rather, all of the relevant precedent makes clear that commenting on a defendant's post-Miranda silence in this manner is a violation of due process. In this case, moreover, the use of defendant's silence was especially egregious because the State employed it

24

as evidence of guilt in its opening statement, case in chief, and closing argument. Such an error is not harmless. Not only did the evidence of defendant's silence directly attack the only disputed element of the charge, but every court that has confronted a similar constitutional error has concluded that it was not harmless, including this Court. I dissent.

## I. Defendant's Fifth and Fourteenth Amendment Rights

¶ 52. A defendant's post-Miranda silence generally cannot be used. See United States v. Moore, 104 F.3d 377, 387 (D.C. Cir. 1997). This rule grew from Fifth Amendment jurisprudence, which "forbids . . . comment by the prosecution on the accused's silence." Griffin v. California, 380 U.S. 609, 615 (1965). Although Griffin involved a prosecutor's comment during trial about the defendant's failure to testify, the Supreme Court subsequently held that the rule extends backward to custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 468 n.37 (1966) ("The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation." (citing Griffin, 380 U.S. 609)). Indeed, the prophylactic warnings proscribed in Miranda were intended to inform individuals that the constitutional prohibition against using a defendant's silence attaches at the time of custodial interrogation and that any statements made could be used against the individual. Miranda, 384 U.S. at 444.

¶ 53. In the foundational case examining the use of silence for impeachment, Doyle v. Ohio, the U.S. Supreme Court held that a prosecutor could not use a defendant's post-Miranda silence to impeach the defendant. 426 U.S. 610, 619 (1976). In Doyle, the defendants were arrested for participating in a routine marijuana deal and given Miranda warnings. After Miranda warnings were given, the defendants did not provide an alternative explanation for their behavior or protest their innocence, but one defendant asked what was going on. At trial, they took the stand and offered, for the first time, an exculpatory explanation for their participation in the deal. The State argued that it could impeach their testimony on cross-examination by asking the defendants why they had not provided their exculpatory stories or protested their innocence

at the time of their arrest. The State did not contend that the defendants' silence could be used as evidence of guilt, but argued that the truth-finding purpose of cross-examination justified the use of the defendants' silence. The Supreme Court rejected this position. Id. at 618. In doing so, the Supreme Court acknowledged the fundamental importance of cross-examination, but concluded that Miranda warnings contained an implicit assurance that a defendant's silence would not be penalized. Id. Given this implicit guarantee, the Supreme Court emphasized that "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." Id. at 618. As a result, the use of defendant's silence in these circumstances violated the Due Process Clause of the Fourteenth Amendment.[6] Id. at 619.

¶ 54. Subsequently, the Supreme Court made clear that the due process concerns articulated in Doyle do not preclude prosecutors from impeaching defendants with their post-Miranda statements in certain limited circumstances.[7] In Anderson v. Charles, the Supreme Court held that "Doyle does not apply to cross-examination that merely inquires into prior inconsistent statements" made after the defendant received Miranda warnings. 447 U.S. 404, 408 (1980) (per curiam). Impeachment using these statements is permissible because "such questioning makes no unfair use of silence." Id. That is, instead of being "designed to draw

---

[6]    Critically, the Doyle decision rested on due process grounds, not on the Fifth Amendment privilege against self-incrimination. See Wainwright v. Greenfield, 474 U.S. 284, 291 n.6 (1986); see also Salinas v. Texas, __ U.S. __, 133 S. Ct. 2174, 2182 n.3 (2013) (plurality opinion) (concluding that suspect who stands mute has not done enough to invoke his Fifth Amendment privilege, but noting "that due process prohibits prosecutors from pointing to the fact that a defendant was silent after he heard Miranda warnings" (citing Doyle, 426 U.S. at 617-18)).

[7]    Use of defendant's prearrest silence for impeachment purposes is permissible. See Jenkins v. Anderson, 447 U.S. 231, 235, 238-39 (1980) (holding that impeaching defendant's credibility using his or her prearrest silence did not violate either Fifth Amendment's privilege against self-incrimination or fundamental fairness concerns embodied in Fourteenth Amendment).

meaning from silence," such questions are intended to "elicit an explanation for a prior inconsistent statement" and thus are not unfair uses of silence. <u>Id</u>. at 409.

¶ 55. In the following years, the circuit courts refined the application of this rule, uniformly concluding that, although a prosecutor may cross-examine a defendant about the subject matter of his statements made post-<u>Miranda</u>, the prosecutor may not draw meaning from the defendant's post-<u>Miranda</u> silence, even if the defendant spoke after receiving <u>Miranda</u> warnings.[8] As a result, whether a <u>Doyle</u> violation occurred hinges on the State's use of the defendant's post-<u>Miranda</u> silence, not whether the defendant spoke after receiving <u>Miranda</u> warnings. For example, in <u>United States v. Canterbury</u>, the Tenth Circuit noted that, although the defendant answered some questions after receiving <u>Miranda</u> warnings, his "partial silence" did not "preclude him from claiming a violation of his due process rights under <u>Doyle</u>." 985 F.2d 483, 486 (10th Cir. 1993). The court then looked to the intent of the prosecutor's questions during cross-examination, particularly a question focusing on the defendant's failure to tell the police that he had been set up.[9] <u>Id</u>. at 485. Because this question was not directed to the

---

[8] This is a formulation adopted by all of the circuit courts. See, e.g., <u>United States v. Ware</u>, 420 F. App'x 886, 892-93 (11th Cir. 2011) (finding no error "[b]ecause the question did not address [defendant's] failure to offer exculpatory evidence upon arrest, but rather simply addressed the context of [defendant's] statement on arrest"); <u>United States v. Laury</u>, 985 F.2d 1293, 1303-04 (5th Cir. 1993) ("Nevertheless, we held in <u>Carter</u> that a <u>Doyle</u> violation does occur where the prosecution comments on the defendant's failure to give an alibi prior to trial but subsequent to arrest."); <u>Smith v. Cadagin</u>, 902 F.2d 553, 559 (7th Cir. 1990) ("The defendant, by the degree of expansiveness of his post-arrest statement, defines the permissible subject matter of any later cross-examination."); <u>Bass v. Nix</u>, 909 F.2d 297, 304 (8th Cir. 1990) ("The key to the inquiry has always been whether the impeachment was based on post-arrest statements contradicting later trial testimony or whether the impeachment was based on silence contradicting later trial testimony. . . . <u>Doyle</u> applies when, as in the instant case, the impeachment was based on silence." (citation omitted)); <u>Grieco v. Hall</u>, 641 F.2d 1029, 1034 (1st Cir. 1981) ("This does not mean that any time a defendant makes any post-arrest statement the door is open to full cross-examination about the defendant's failure to recount the exculpatory trial story earlier."); <u>United States v. Curtis</u>, 644 F.2d 263, 271 n.4 (3d Cir. 1981) (concluding <u>Doyle</u> violation occurred because "cross examination was not directed to any prior statement, but solely to post-arrest silence").

[9] The specific question to the defendant was as follows: "[I]sn't it—I'll just rephrase it. Isn't it a fair statement that at no time after your arrest on August 29, either at the Burger King or

27

defendant's post-Miranda statements, but "was designed to suggest an inference of guilt from the defendant's post-arrest silence," the court concluded that a Doyle violation occurred. Id. at 486.

¶ 56. In addition to the importance of determining if the prosecutor intended to infer guilt from the defendant's silence, subsequent precedent also makes clear that the State's use of a defendant's post-Miranda silence as affirmative proof is an especially offensive violation of due process rights. In Wainwright v. Greenfield, the prosecution attempted to use the defendant's post-Miranda silence as substantive evidence of the defendant's sanity. 474 U.S. 284, 288-87 (1986). The Supreme Court held that this use violated the defendant's due process rights. Id. at 295. In doing so, the Supreme Court reviewed its precedent and found that, "unlike Doyle and its progeny, the silence was used as affirmative proof in the case in chief, not as impeachment." Id. at 292. Such a use was "especially egregious," because, unlike Doyle, there was no danger that the prosecution's ability to cross-examine the defendant would be undercut by a rule protecting the use of the defendant's silence during the State's case in chief. Id. at 292 n.8. Moreover, the Supreme Court concluded that the fundamental fairness concerns underlying Doyle applied equally when the prosecutor affirmatively used the defendant's post-Miranda silence to prove his or her sanity. Id. at 295.

¶ 57. Thus, to summarize the current law, the prohibition against using a defendant's post-Miranda silence grew from the core privilege against self-incrimination guaranteed by the Fifth Amendment, Griffin, 380 U.S. at 615, but now rests on the implicit assurances guaranteed by Miranda warnings and protected by the Due Process Clause. Wainwright, 474 U.S. at 295. Because the use of a defendant's post-Miranda silence is fundamentally unfair, a prosecutor may not draw meaning from a defendant's post-Miranda silence, either during cross-examination or as substantive evidence in its case in chief, even if the defendant spoke after receiving Miranda

---

at the police station, did you ever state to the police officer I've been set up?" Canterbury, 985 F.2d at 485.

28

warnings.[10]  Moreover, if the prosecutor improperly employs the defendant's silence in its case in chief, that use is especially egregious.

¶ 58.    Given this precedent, the State's use of defendant's post-Miranda silence in this case was error for several reasons.  First, the State raised defendant's post-Miranda silence during its case in chief, on redirect examination of the officer.[11]  As described above, the relevant caselaw is directly contrary to the proposition that the State may use a defendant's silence as affirmative proof in this manner, even if the defendant spoke after receiving Miranda statements.  In Doyle, one of the defendants spoke after receiving Miranda warnings, but the Supreme Court still concluded that "it would be fundamentally unfair . . . to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial."  Doyle, 426 U.S. at 618.  Indeed, in State v. Mosher, this Court expressly focused on the prosecutor's "use of defendant's silence during its case in chief," Mosher, 143 Vt. 197, 205 n.2, 465 A.2d 261, 266 n.2 (1983), and we concluded that it was "error for the State to use defendant's silence as substantive evidence of guilt." Id. at 205, 465 A.2d at 266.  Now, the majority abandons our former position merely because the State's substantive use occurred during redirect examination, without explaining why the implicit promise contained in Miranda carries less weight during redirect examination than if elicited during direct examination.

---

[10]    As described above, a prosecutor may impeach a defendant using the inconsistent statements he or she made after receiving Miranda warnings.  See Jenkins, 447 U.S. at 238-39.

[11]    The majority claims, without citing to any precedent, that, because defendant's counsel raised the exculpatory version of events in a suppression hearing prior to trial, the State was aware of defendant's trial strategy and, as a result, at trial, could comment on defendant's silence prior to defendant presenting his exculpatory story.  But defendant did not testify at the suppression hearing and, thus, any comments regarding his silence were first raised by the State in its opening statement.  Second, even if defendant did testify at the suppression hearing, it is well-settled that "when a defendant testifies in support of a motion to suppress evidence . . . his testimony may not thereafter be admitted against him a trial on the issue of guilt unless he makes no objection." Simmons v. United States, 390 U.S. 377, 394 (1968) (emphasis added).

29

¶ 59. Moreover, even if the majority is correct that, because redirect examination is rehabilitative in nature, it is legally distinct from producing evidence on direct examination, the State did not confine its "rehabilitative" question to the statements defendant made during his DUI processing. Instead, the prosecutor's question "was designed to suggest an inference of guilt from . . . defendant's post-arrest silence" during the months leading up to trial. See Canterbury, 985 F.2d at 486. Because of this improper inference, if the prosecutor had asked defendant this question at any point during the trial,[12] it would have violated Doyle.

¶ 60. On redirect examination of Officer Weinisch, the State asked the officer, "In the three months following this investigation, did the defendant or any of the defendant's friends or relatives, ever call you or the Burlington Police Department, to your knowledge, to indicate that somebody else was driving that night?" Plainly, this question was intended to draw meaning from defendant's silence and was not focused on the statements defendant made during his DUI processing. A similarly improper question occurred in Laury, 985 F.2d at 1301. As in this case, the defendant in Laury stated on cross-examination that, although he did not provide an alibi prior to arrest, he did inform the police that he didn't commit the charged crime. The Fifth Circuit concluded that cross-examination into the statements he made during his arrest was proper. Id. at 1302 (citing Jenkins, 447 U.S. at 240). But the prosecutor also asked the

---

[12] In fact, the State did attempt to pursue the same improper questioning in its cross-examination of defendant:

> STATE. You never protested, correct?
> DEFENDANT. Correct
> STATE. And after that night, and the last three months, you—did you ever file a complaint with the Burlington Police Department?
> DEFENDANT. I had not.
> STATE. Did you ever call the Burlington Police Department to complain about Officer Weinisch's conduct?
> DEFENDANT. No.
> STATE. And in fact, today is the first time that you, yourself had made any kind of public statement?

At this point, defense counsel objected on Doyle grounds, and the court sustained defendant's objection.

defendant why he hadn't provided his alibi either immediately following his arrest or in the months leading up to trial. The Fifth Circuit held that both of these subsequent questions violated Doyle, even though the defendant made post-Miranda statements to government agents. Id. at 1303-04, 1305. In doing so, the Fifth Circuit acknowledged the distinction between the prosecutor's ability to cross-examine a defendant about the subject matter of his post-Miranda statements and the prosecutor's use of a defendant's post-Miranda silence to imply guilt. Id. As described above, federal court precedent has clearly established that the first is permitted, while the latter is not. See also State v. Hunt, 150 Vt. 483, 500, 555 A.2d 369, 380 (1988) (noting that "the prosecutor may comment to the jury, and use for impeachment, inferences from the statements which [the defendant] made of his own volition" (emphasis added)).

¶ 61. Despite this plain precedent, the majority position allows the State unfettered use of a defendant's silence as long as the defendant spoke after receiving Miranda warnings. This is simply not the law.[13] The question is whether "[t]he questions were . . . designed to draw

---

[13] Even the majority relies on precedent that explicitly acknowledges this fundamental distinction between the improper use of a defendant's post-Miranda silence as affirmative proof and the limited exceptions that allow the use of a defendant's post-Miranda statements as impeachment evidence. For example, in Brecht v. Abrahamson, the Supreme Court noted that the State could impeach defendant on the basis of the defendant's silence prior to receiving Miranda warnings, but that once the defendant received Miranda warnings, "the State's references to petitioner's silence after that point in time, or more generally to petitioner's failure to come forward with his version of events at any time before trial, crossed the Doyle line." 507 U.S. 619, 628-29 (1993) (emphasis added); see also Salinas, 133 S. Ct. at 2179, 2182 n.3 (declining to address whether prosecution could use defendant's pre-Miranda silence during noncustodial police interview as part of its case in chief, but noting "that due process prohibits prosecutors from pointing to the fact that a defendant was silent after he heard Miranda warnings"); Portuondo v. Agard, 529 U.S. 61, 69 (2000) ("Griffin prohibited comments that suggest a defendant's silence is 'evidence of guilt.' The prosecutor's comments in this case, by contrast, concerned respondent's credibility as a witness, and were therefore in accord with our longstanding rule that when a defendant takes the stand, 'his credibility may be impeached and his testimony assailed like that of any other witness.' " (citations omitted)); United States v. Carter, 953 F.2d 1449, 1463-64 n.6 (5th Cir. 1992) (analyzing government's comments made during cross-examination, but noting, "[u]se of post-arrest silence for its substantive value is . . . prohibited" (emphasis added)); State v. Marshall, 334 P.3d 866, 871-72 (Kan. Ct. App. 2014) ("Rather than a comment on [the defendant's] silence, it is apparent that here the State is using the incriminating statements made . . . to impeach [the defendant's] claim . . . ." (emphasis added)).

meaning from silence" or "to elicit an explanation for a prior inconsistent statement." Charles, 447 U.S. at 409. In this case, the State's clear intent was to draw meaning from defendant's silence, because defendant did not make any statements at all during those months leading up to trial. Such use of defendant's silence violated Miranda's implicit assurance that his silence would not be used against him. See Brecht, 507 U.S. at 628-29 ("[T]he State's references to petitioner's silence after [receiving Miranda warnings], or more generally to petitioner's failure to come forward with his version of events at any time before trial, crossed the Doyle line." (emphasis added)). This was error, and should not stand.

## II. Harmless Error

¶ 62. Further, this error was not harmless because the error affected defendant's substantial rights. See V.R.Cr.P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."). Error is harmless if we can say beyond a reasonable doubt that the jury would have convicted absent the error. See State v. Lynds, 158 Vt. 37, 42, 605 A.2d 501, 503 (1991); see also V.R.Cr.P. 52(a).

¶ 63. To begin, contrary to the majority's claim, the appropriate standard for considering whether a Doyle violation was harmless error does not depend solely on "the strength of the State's case apart from the offending evidence and the strength of the offending evidence itself." State v. Kinney, 2011 VT 74, ¶ 6, 190 Vt. 195, 27 A.3d 348. As the Third Circuit recently reiterated in its analysis of a potential Doyle violation, "[C]onstitutional harmless-error analysis is not merely a review of whether the jury 'could have' returned a verdict absent the constitutional error. Such an analysis improperly conflates sufficiency-of-the-evidence review with the appropriate [harmless error] standard." Virgin Islands v. Martinez, 620 F.3d 321, 338 (3d Cir. 2010). Although "the quantum of other evidence indicative of guilt" is one of the factors to be considered, the other four factors include,

> 1. The use to which the prosecution puts the postarrest silence.
> 2. Who elected to pursue the line of questioning.

. . .
    4. The intensity and frequency of the reference.
    5. The availability to the trial judge of an opportunity to grant a
    motion for mistrial or to give curative instructions.

Canterbury, 985 F.2d at 487 (quotation omitted); see also Mosher, 143 Vt. at 209-10, 465 A.2d at

268 (analyzing Doyle violation for harmless error based on "whether the comment by the

prosecution is extensive, whether the inference of guilt from silence is stressed to the jury as a

basis of conviction and whether there is evidence that could have supported acquittal").

"Moreover, the beneficiary of the error, here the State, has the burden of proving that no injury

occurred as a consequence of the error." Mosher, 143 Vt. at 208, 465 A.2d at 267.

¶ 64. In this case, because the "mere great weight of evidence of guilt will not obviate a

constitutional error," id., the majority's focus on the sufficiency of the evidence and, in

particular, whether it was plausible, is inadequate.[14] By ignoring the other factors described

above, the majority does not fully consider whether the evidence in question contributed to the

conviction. See id. ("The evidence in question must not have contributed to the conviction."

(emphasis added)). This is especially true because the other factors dictate that the error was not

harmless. For example, the State elected to pursue defendant's silence first and the trial court did

not give a curative instruction to the jury.

¶ 65. Most important, the State frequently used defendant's silence to guide the jury's

consideration of the core issue disputed at trial: the driver's identity. To convict defendant of

driving under the influence, the State needed to prove that defendant operated his vehicle. See

---

  [14] The majority claims that, given the evidence, the State's comments were harmless error because defendant's story was not "reasonably plausible." Ante, ¶ 31. This argument depends on a questionable assumption: the majority assumes the officer testified truthfully and accurately regarding the driver's identity and that the other three witnesses testified falsely. By making this assumption, moreover, the majority improperly conducts its own credibility determination in lieu of the jury and opines on the persuasive effect of the witnesses and testimony. Cf. State v. Parker, 139 Vt. 179, 182, 423 A.2d 851, 852 (1980) ("The trier of fact has the sole determination concerning the weight of the evidence, the credibility of the witnesses and the persuasive effect of the testimony." (citation omitted)).

23 V.S.A. § 1201(a)(1). Most of the evidence cited by the majority, circumstantial or otherwise, did not point to the vehicle's operator. The only evidence the State submitted to prove that defendant drove the car was the testimony of the investigating officer and the DUI affidavit.[15] This evidence was countered by the testimony from defendant's mother, cousin, and defendant himself. Thus, in order to establish who operated the vehicle and to find defendant guilty, the jury must have determined that the officer was more credible than the defense witnesses.

¶ 66. To bolster the officer's credibility, the State attempted to discredit defendant's exculpatory version of the events by commenting on defendant's silence. Specifically, the State made four direct references to defendant's silence.

¶ 67. First, the State told the jury in its opening statement that "neither on that night, nor in the months that have passed since the arrest, until about one month ago, at no time did the defendant . . . call the Burlington Police Department to tell them that somebody else was driving."

¶ 68. Next, after defendant's cross-examination of the officer established that the officer did not actually see the car's operator and that he lost sight of the vehicle for several seconds on defendant's driveway, the State used defendant's pretrial silence to attack defendant's claim that defendant's cousin drove the car that night. Specifically, the prosecutor asked the investigating officer if defendant had ever, in the months leading up to the trial, called the officer or the Burlington Police Department to "indicate that somebody else was driving that

---

[15] The majority claims that defendant admitted to driving the car, but this statement artfully blurs the facts. Ante, ¶ 22. The officer testified that defendant answered three questions listed on the DUI affidavit: "Where were you driving to?", "Where were you driving from?", and "How long ago did you drive from that location?" As the officer acknowledged, none of the questions specifically asked whether defendant operated the vehicle and defendant never actually said that he operated the car, although defendant's oral answers to the written questions suggested that he had driven the car. Moreover, the officer and defendant disagreed about the oral statements defendant made pre-Miranda warnings: the officer claimed defendant admitted to driving the car, but defendant testified that he responded negatively when the officer asked him if he operated the car.

night?" Defendant objected to this line of questioning, pointing out that defendant had no obligation under the Fifth Amendment to provide an exculpatory story to the police. The trial court overruled defendant's objection, and the officer testified that defendant never told him that someone else was driving the vehicle or contacted the police department.

¶ 69. Third, while cross-examining defendant, the State focused on defendant's failure to further protest his arrest and his failure to tell the police during the months leading up to trial that his cousin drove the car. In particular, the State asked whether, "after that night, and the last three months . . . [defendant] ever file[d] a complaint with the Burlington Police Department" and pointed out that the trial was "the first time that [defendant] . . . , made any kind of public statement." At this point, defendant objected again and the trial court sustained the objection, apparently recognizing the constitutional rights the majority erroneously rejects.

¶ 70. Finally, in the closing arguments, the State highlighted the officer's testimony and again noted "that neither on that night, nor in the months following that incident, did the defendant or any of defendant's family tell [the officer] that anybody besides the defendant was driving the vehicle."

¶ 71. Together these statements demonstrate that defendant's post-Miranda silence was a central theme of the State's case and aimed at influencing the jury's credibility determination. The State's comments about defendant's post-Miranda silence were extensive, continued throughout the proceeding, and were a direct attack on defendant's credibility. The State implied, in all of these instances, that defendant was guilty because defendant failed to provide his exculpatory story at arrest and in the months prior to his trial. As described above, these comments violated settled law. See, e.g., Canterbury, 985 F.2d at 486. Moreover, when evaluating whether Doyle violations influenced a jury's deliberations, appellate courts—and even this Court—have concluded that frequent comments of this nature are not harmless error if the defense's case heavily depends on the defendant's credibility. Compare Mosher, 143 Vt. at

35

208, 465 A.2d at 267 (finding error was not harmless where State's case turned on credibility of witnesses and prosecutor's extensive comments stressed inference of guilt from silence), with Kinney, 2011 VT 74, ¶ 13 (finding no error where prosecutor drew inferences from statements defendant made during his arrest but neither commented on defendant's post-Miranda silence nor raised defendant's silence in opening remarks). For example, in Canterbury, the Tenth Circuit concluded that the Doyle violation was not harmless beyond a reasonable doubt because the "the success of the defense hinged almost entirely on the defendant's credibility." 985 F.2d at 487; see also Velarde v. Shulsen, 757 F.2d 1093, 1096 (10th Cir. 1985) (concluding chance of prejudice greater when comment on silence occurs in one-day trial, with no curative instruction); United States v. Shannon, 766 F.3d 346, 359 (3d Cir. 2014) (concluding error was not harmless where "credibility was likely important to the outcome of the case").

¶ 72. Despite this clear precedent, the majority concludes that the error was harmless because defendant's post-Miranda statements ultimately would have been admitted to impeach the statements defendant made during his arrest or to rebut the other witnesses' testimony.[16] Ante, ¶¶ 35-36. To reiterate, this is an incorrect summation of the law. The State's use of defendant's statements do not form the basis for the Doyle violation; the error was the State's use of his silence. Because that error was frequent and aimed at undermining defendant's credibility regarding a crucial element of the charge, it was not harmless beyond a reasonable doubt.

¶ 73. I am authorized to state that Justice Robinson joins this dissent.

_____
Associate Justice

---

[16] In addition to the other errors described, this argument ignores precedent from this Court explicitly rejecting this "relation-back doctrine" of impeachment. In Mosher, we noted that such an argument "assumes without basis that the defendant would inevitably have taken the stand in his own defense" and thus concluded that the State's early introduction of the evidence could have compelled the defendant to testify and defend himself in violation of the Fifth Amendment. 143 Vt. at 207, 465 A.2d at 267.